"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    **(a)** Any "nuclear reactor";

    **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

    **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007 IL 00 21 09 08

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

IL 09 35 08 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

   **1.** The failure, malfunction or inadequacy of:

      **a.** Any of the following, whether belonging to any insured or to others:

         **(1)** Computer hardware, including microprocessors;

         **(2)** Computer application software;

         **(3)** Computer operating systems and related software;

         **(4)** Computer networks;

         **(5)** Microprocessors (computer chips) not part of any computer system; or

         **(6)** Any other computerized or electronic equipment or components; or

      **b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

   due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

   **2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

   **1.** In a Covered Cause of Loss under the Boiler And Machinery Coverage Part, the Commercial Crime Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

   **2.** Under the Commercial Property Coverage Part:

      **a.** In a "Specified Cause of Loss," or in elevator collision resulting from mechanical breakdown, under the Causes of Loss - Special Form; or

      **b.** In a Covered Cause of Loss under the Causes of Loss - Basic Form or the Causes of Loss - Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss," elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

IL 09 35 08 98     Copyright, Insurance Services Office, Inc., 1998     Page 1 of 1

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

COMMERCIAL GENERAL LIABILITY
CG 21 49 09 99

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f.   Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

CG 21 49 09 99          Copyright, Insurance Services Office, Inc., 1998          Page 1 of 1

IL 01 94 04 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SOUTH CAROLINA CHANGES – LEGAL ACTION AGAINST US

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART – FARM LIVESTOCK COVERAGE FORM
FARM COVERAGE PART – FARM MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE
    FORM
FARM COVERAGE PART – FARM PROPERTY – OTHER FARM PROVISIONS FORM – ADDITIONAL
    COVERAGES, CONDITIONS, DEFINITIONS
STANDARD PROPERTY POLICY

**A.** The **Legal Action Against Us** Condition, in the Commercial Property Conditions, the Standard Property Policy, and in the Farm Forms listed above, is replaced by the following:

**LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part, Coverage Form or Policy to which this Condition applies unless:

**1.** There has been full compliance with all of the terms of this Coverage Part, Coverage Form or Policy; and

**2.** The action is brought within 3 years after the date on which the direct physical loss ("loss") or damage occurred.

**B.** Under the Commercial Property Coverage Part, Paragraph **a.** of the **Legal Action Against Us** Condition in the Mortgageholders Errors And Omissions Coverage Form is replaced by the following:

**a.** No one may bring a legal action against us under Coverages **A** and **B** unless:

**(1)** There has been full compliance with all of the terms of Coverages **A** and **B**; and

**(2)** The action is brought within 3 years after you discover the error or accidental omission.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

IL 01 94 04 98                    Copyright, Insurance Services Office, Inc., 1997                    Page 1 of 1

IL 02 49 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SOUTH CAROLINA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of **Cancellation** Common Policy Condition are replaced by the following:

   **2.** We may cancel this policy by mailing or delivering to the first Named Insured and the agent, if any, written notice of cancellation at least:

      **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

   **3.** We will mail or deliver our notice to the first Named Insured's and agent's last known addresses.

**B.** The following is added to the **Cancellation** Common Policy Condition:

   **7. Cancellation Of Policies In Effect For 120 Days Or More**

   If this policy has been in effect for 120 days or more, or is a renewal or continuation of a policy we issued, we may cancel this policy only for one or more of the following reasons:

      **a.** Nonpayment of premium;

      **b.** Material misrepresentation of fact which, if known to us, would have caused us not to issue the policy;

      **c.** Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing the policy;

      **d.** Substantial breaches of contractual duties, conditions or warranties; or

      **e.** Loss of our reinsurance covering all or a significant portion of the particular policy insured, or where continuation of the policy would imperil our solvency or place us in violation of the insurance laws of South Carolina.

      Prior to cancellation for reasons permitted in this Item e., we will notify the Commissioner, in writing, at least 60 days prior to such cancellation and the Commissioner will, within 30 days of such notification, approve or disapprove such action.

   Any notice of cancellation will state the precise reason for cancellation.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**C.** The following is added and supersedes any provisions to the contrary:

**Nonrenewal**

**1.** We will not refuse to renew a policy issued for a term of more than one year, until expiration of its full term, if anniversary renewal has been guaranteed by additional premium consideration.

**2.** If we decide not to renew this policy, we will:

**a.** Mail or deliver written notice of nonrenewal to the first Named Insured and agent, if any, before:

**(1)** The expiration date of this policy, if the policy is written for a term of one year or less; or

**(2)** An anniversary date of this policy, if the policy is written for a term of more than one year or for an indefinite term; and

**b.** Provide at least:

**(1)** 60 days' notice of nonrenewal, when nonrenewal is to become effective between November 1 and May 31; or

**(2)** 90 days' notice of nonrenewal, when nonrenewal is to become effective between June 1 and October 31.

**3.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured's and agent's last known addresses. If notice is mailed, proof of mailing will be sufficient proof of notice.

**4.** Any notice of nonrenewal will state the precise reason for nonrenewal.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

## NOTICE AND DISCLOSURE

This notice outlines the service fees charged by Builders Mutual and Builders Premier Insurance Company for policies written in South Carolina.

For all policies,each check returned to the policyholder for insufficient funds ("NSF") will result in a $25 fee charged to the policyholder.

S-24-07  0415

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**COMMERCIAL GENERAL LIABILITY**
**CG 21 96 03 05**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I — Coverage A — Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I — Coverage B — Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**FLOOD INSURANCE NOTICE**

Builders Mutual Insurance Company is advising their policyholders that their property policy(s) does not provide coverage for flood, surface water, waves, tidal water, or any other overflow of a body of water.  You will **not** have coverage for damage to real property and/or contents (business and/or personal property) due to flood, surface water, waves, tidal water, or any other overflow of a body of  water, unless you take steps to purchase for an additional premium, a separate policy for flood insurance.

This notice does not expand or increase coverage in any property policy or endorsement.  This policy and accompanying endorsement remain subject to all exclusions, limitations and conditions.

If you would like more information about obtaining flood insurance, please contact your agent or the National Flood Insurance Program at 770-220-5200.

BIL 0020  07-04

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

# IMPORTANT NOTICE

Effective with this renewal, your policy will contain the following exclusion endorsement with some broadening of coverage being provided.

- **Fungus, Wet Rot, Dry Rot and Bacteria Exclusion (BCP 0003 0704)**

**THIS ENDORSEMENT CHANGES YOUR POLICY AND IS BEING ADDED TO ALL BMIC COMMERCIAL PROPERTY POLICIES.  PLEASE READ YOUR RENEWAL POLICY AND THE ENDORSEMENTS CAREFULLY UPON RECEIPT.**

Any questions you have regarding your renewal policy should be directed to your agent.

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BUILDERS MUTUAL INSURANCE COMPANY

# FUNGUS, WET ROT, DRY ROT AND BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

CAUSE OF LOSS – SPECIAL FORM
BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM
EXTRA EXPENSE COVERAGE FORM
ORDINANCE OR LAW COVERAGE FORM

**A.** The following is added to **B. 1** . of the Exclusions section in the Cause of Loss – Special Form:

    **h.** "Fungus", Wet Rot, Dry Rot and Bacteria

Presence, growth, proliferation,  spread or any activity of "fungus", wet or dry rot or bacteria, including the cost to test, monitor, clean up, remove, contain, treat, detoxify, or neutralize the effects of "fungus", wet or dry rot, or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

The exclusion does not apply to the extent that coverage is provided in **h. (1)** through **h. (4).**

**(1)** If the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria is the result of a "specified cause of loss" that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after the occurrence, we will pay up to $15,000 to remove or treat the "fungus", wet or dry rot or bacteria.

Of this amount, we will pay no more than $5,000 for the cost of testing to confirm the presence or level of "fungus", wet or dry rot or bacteria, whether performed during or after removal, repair, restoration or replacement.

The limit provided for testing is included within and not in addition to the limit provided for the removal and treatment of the "fungus", wet or dry rot or bacteria

**(2)** Regardless of the number of claims, this $15,000 limit is the most we will  pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" which take place in a 12 month period (starting with the beginning of the present annual policy period).  With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

BCP 0003 07 04

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**(3)**   The coverage provided does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot, or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

**(4)**   The following applies only if Business Income and/or Extra Expense coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense coverage form.

   **(a)**   If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days.  The days need not be consecutive.

   **(b)**   If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**B.**   Paragraph **B.2.d.(2)**  of the Exclusion section in the Cause of Loss – Special Form is deleted and  replaced by the following:

   (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

**C.**   The following Additional Exclusion is added to Paragraph **B.**  of the Ordinance or Law Coverage Endorsement if attached to this policy:

   We will not pay under this coverage for the cost associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess to effects of  "fungus", wet or dry rot or bacteria.

**D.**   The following definition is added:

   "Fungus" means any type or form of fungus, including, but not limited to, mold or mildew, musts, and any mycotoxins, spores, scents or byproducts produced or released by fungi.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

BCP 0003 07 04

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Copyright, Insurance Services Office, Inc., 1997

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

POLICY NUMBER: CPP 0048066 06

COMMERCIAL GENERAL LIABILITY
CG 20 10 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
| DR HORTON INC, IAAS<br>C/O INSURANCE COMPLIANCE<br>P O BO 12010-DR<br>HEMET CA 92546 | ALL WORK DONE PER WRITTEN CONTRACT |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

**1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

**2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 04 13

© Insurance Services Office, Inc., 2012

Page 1 of 2

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012   **CG 20 10 04 13**

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I — Coverage A — Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I — Coverage B — Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

IL 09 95 01 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN PROTECTION COVERAGE FORM
FARM COVERAGE PART
STANDARD PROPERTY POLICY

## SCHEDULE

| The **Exception Covering Certain Fire Losses** (Paragraph **D.**) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy: | |
| --- | --- |
| **State(s)** | **Coverage Form, Coverage Part Or Policy** |
| | |
| | |
| | |
| | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A. Applicability Of The Provisions Of This Endorsement**

1. The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Form, Coverage Part or Policy; or

b. **A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:**

(1) **Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or**

(2) **Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or**

(3) **Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.**

2. **If the provisions of this endorsement become applicable, such provisions:**

a. **Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to loss or damage from an incident(s) of terrorism (however defined) that occurs on or after the date when the provisions of this endorsement become applicable; and**

b. **Remain applicable unless we notify you of changes in these provisions, in response to federal law.**

3. **If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.**

B. The following definition is added and applies under this endorsement wherever the term terrorism is enclosed in quotation marks.

"Terrorism" means activities against persons, organizations or property of any nature:

1. That involve the following or preparation for the following:

a. Use or threat of force or violence; or

b. Commission or threat of a dangerous act; or

c. Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

2. When one or both of the following applies:

a. The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

b. It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

C. The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for loss or damage caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

 © ISO Properties, Inc., 2005 IL 09 95 01 07

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED – 2025 Aug 20 3:39 PM – JASPER – COMMON PLEAS – CASE#2025CP2700479

**5.** The total of insured damage to all types of property in the United States, its territories and possessions, Puerto Rico and Canada exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions. Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the threshold is exceeded.

With respect to this Item **C.5.,** the immediately preceding paragraph describes the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Coverage Part or Policy.

**D. Exception Covering Certain Fire Losses**

The following exception to the Exclusion Of Terrorism applies only if indicated and as indicated in the Schedule of this endorsement.

If "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

**E. Application Of Other Exclusions**

**1.** When the Exclusion Of Terrorism applies in accordance with the terms of **C.1.** or **C.2.,** such exclusion applies without regard to the Nuclear Hazard Exclusion in this Coverage Form, Coverage Part or Policy.

**2.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage which would otherwise be excluded under this Coverage Form, Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

IL 02 49 10 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SOUTH CAROLINA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of **Cancellation** Common Policy Condition are replaced by the following:

**2.** We may cancel this policy by mailing or delivering to the first Named Insured and the agent, if any, written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's and agent's last known addresses.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7. Cancellation Of Policies In Effect For 120 Days Or More**

If this policy has been in effect for 120 days or more, or is a renewal or continuation of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**a.** Nonpayment of premium;

**b.** Material misrepresentation of fact which, if known to us, would have caused us not to issue the policy;

**c.** Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing the policy;

**d.** Substantial breaches of contractual duties, conditions or warranties; or

**e.** Loss of our reinsurance covering all or a significant portion of the particular policy insured, or where continuation of the policy would imperil our solvency or place us in violation of the insurance laws of South Carolina.

Prior to cancellation for reasons permitted in this Item e., we will notify the Commissioner, in writing, at least 60 days prior to such cancellation and the Commissioner will, within 30 days of such notification, approve or disapprove such action.

Any notice of cancellation will state the precise reason for cancellation.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**C.** The following is added and supersedes any provisions to the contrary:

**Nonrenewal**

**1.** We will not refuse to renew a policy issued for a term of more than one year, until expiration of its full term, if anniversary renewal has been guaranteed by additional premium consideration.

**2.** If we decide not to renew this policy, we will:

**a.** Mail or deliver written notice of nonrenewal to the first Named Insured and agent, if any, before:

**(1)** The expiration date of this policy, if the policy is written for a term of one year or less; or

**(2)** An anniversary date of this policy, if the policy is written for a term of more than one year or for an indefinite term; and

**b.** Provide at least:

**(1)** 60 days' notice of nonrenewal, when nonrenewal is to become effective between November 1 and May 31; or

**(2)** 90 days' notice of nonrenewal, when nonrenewal is to become effective between June 1 and October 31.

**3.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured's and agent's last known addresses. If notice is mailed, proof of mailing will be sufficient proof of notice.

**4.** Any notice of nonrenewal will state the precise reason for nonrenewal.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

IL 09 52 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

COMMERCIAL GENERAL LIABILITY
CG 21 87 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A. Applicability Of The Provisions Of This Endorsement**

1. The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

    a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Part or Policy; or

    b. A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

        (1) Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

        (2) Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

        (3) Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

2. If the provisions of this endorsement become applicable, such provisions:

    a. Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to an incident(s) of terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and

    b. Remain applicable unless we notify you of changes in these provisions, in response to federal law.

3. If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

CG 21 87 01 15     © Insurance Services Office, Inc., 2015     Page 1 of 2

B. The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:

1. "Terrorism" means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      (1) Use or threat of force or violence; or

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. "Any injury or damage" means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or Policy.

C. The following exclusion is added:

   **EXCLUSION OF TERRORISM**

   We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

   1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

   2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

   3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

   4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

   5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

   6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

      a. Physical injury that involves a substantial risk of death; or

      b. Protracted and obvious physical disfigurement; or

      c. Protracted loss of or impairment of the function of a bodily member or organ.

   Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs **C.5.** or **C.6.** are exceeded.

   With respect to this Exclusion, Paragraphs **C.5.** and **C.6.** describe the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part or Policy.

   The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

 © Insurance Services Office, Inc., 2015 CG 21 87 01 15

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**IL N 001 09 03**

# FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the cover-ages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

    Foreign agents;
    Front organizations;
    Terrorists;
    Terrorist organizations; and
    Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**IL 00 03 09 08**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

    CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    CRIME AND FIDELITY COVERAGE PART
    EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
    EQUIPMENT BREAKDOWN COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II — Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V —Definitions.

## SECTION I – COVERAGES

## COVERAGE A — BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and

        (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

    b. This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" occurs during the policy period; and

        (3) Prior to the policy period, no insured listed under Paragraph **1.** of Section II — Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

    c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

    d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

        (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

        (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

        (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

    e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**f.** **Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any

 © Insurance Services Office, Inc., 2012

insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**j.   Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III — Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k.   Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.   Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.   Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.   Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p.   Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software,

including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

© Insurance Services Office, Inc., 2012    CG 00 01 04 13

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**g. Quality Or Performance Of Goods — Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's

name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

---

CG 00 01 04 13     © Insurance Services Office, Inc., 2012     Page 7 of 16

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS — COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

© Insurance Services Office, Inc., 2012
CG 00 01 04 13

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

f.  Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2.  If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a.  The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b.  This insurance applies to such liability assumed by the insured;

c.  The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d.  The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e.  The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f.  The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** — Coverage **A** — Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1.  If you are designated in the Declarations as:

a.  An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b.  A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e.  A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

© Insurance Services Office, Inc., 2012 CG 00 01 04 13

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** — Coverage **A** — Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

ELECTRONICALLY FILED – 2025 Aug 20 3:39 PM – JASPER – COMMON PLEAS – CASE#2025CP2700479

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding,

    © Insurance Services Office, Inc., 2012    CG 00 01 04 13

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

    © Insurance Services Office, Inc., 2012    CG 00 01 04 13

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**POLICY NUMBER:** CPP 0048066 06

IL 60 06 01 10

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MATERIAL COVERAGE CHANGE OR CANCELLATION NOTIFICATION

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) and mailing address: | Location And Description Of Project |
|---|---|
| DR HORTON INC, IAAS<br>C/O INSURANCE COMPLIANCE<br>P O BOX 12010-DR<br>HEMET CA 92546 | ALL WORK DONE PER WRITTEN CONTRACT |

**We will not cancel or reduce coverage under this policy without providing at least \_\_\_30\_\_\_ days notice of our intent to do so. Notice of such cancellation or reduction of coverage will be provided by regular United States Postal Service delivery, to the Named Insured and the Additional Insured in the schedule above.**

IL 60 06 01 10                                                                                    Page 1 of 1

COMMERCIAL PROPERTY                                                        IL 60 10 01 16

# PROPERTY ENHANCEMENT
## With Business Income & Extra Expense

This endorsement modifies insurance provided under the following:
### COMMERCIAL PROPERTY COVERAGE PART

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY
### SUMMARY OF COVERAGE AND INDEX

This is a summary of the various coverages and causes of loss provided by this form.  No coverage is provided by this summary. This endorsement is subject to the provisions of your policy, which means that it is subject to all limitations and conditions applicable to the coverage forms attached to this policy unless specifically deleted, replaced, or modified herein. This endorsement is applicable only to those premises described in the Declarations.

1. Arson, Theft and Vandalism Reimbursement                    $10,000
2. Brands and Labels                                           $25,000
3. Business Income and Extra Expense          - Actual Loss Sustained
4. Valuation:
   - Fabricator's/Manufacturer's Selling Price Valuation       Included
   - Replacement Cost Valuation for Personal Property of Others $10,000
5. Fire Extinguisher Recharge Expense                          $5,000
6. Fire Department Service Charge                              $5,000
7. Newly Acquired or Constructed Property
   - Building                                                  $1,000,000
   - Personal Property                                         $500,000
8. Newly Acquired Location – Business Income and Extra Expense  $250,000
9. Valuable Papers and Records – Cost of Research              $30,000
10. Property Off Premises                                      $20,000
11. Non-Owned Detached Trailers                                $10,000
12. Outdoor Fences                                             $10,000
13. Outdoor Signs                                              $10,000
14. Outdoor Trees, Shrubs and Plants                          $10,000
    (Subject to a $1,000 per item limitation)
15. Radio and Television Receiving Equipment                  $10,000
16. Refrigerated Property                                     $10,000
17. Ordinance or Law Coverage
    - Loss to the Undamaged Portion of the Building            Included
    - Demolition Costs                                         $50,000
    - Increased Cost of Construction                           $50,000
18. Pollutant clean-up and Removal                            $25,000
19. Property in Transit                                        $25,000
20. Back-Up of Sewers & Drains                                $25,000
21. Contractors' Tools and Equipment and Equipment of Others   $5,000
    Tools in a Locked Vehicle                                  $1,000
22. Accounts Receivable                                        $25,000
23. Claim Data Expense                                         $25,000
24. Computers and Media                                        $25,000
25. Fine Arts                                                  $25,000
26. Installation Property                                      $25,000
27. Employee Theft (including Forgery or Alteration)           $25,000
28. Computer Fraud                                             $25,000
29. Lock Replacement                                          $5,000
30. Money, Securities and Stamps (inside/outside)            $5,000
31. Electronic Data                                           $2,500

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

## This endorsement modifies insurance provided under the following:

The insurance provided by this coverage form is primary as respects to any other insurance provided by this company unless the insured has specifically scheduled or described the property under another form then that coverage form shall be primary as respects to the insurance provided by this coverage form.  If a loss covered under this endorsement form also involves a loss under any other coverage form that is made a part of this policy, then the broadest coverage will apply except, if the property is specifically scheduled or described under another coverage form then the valuation provisions of that coverage form will apply:

**Coinsurance** under Additional Conditions F.1. does not apply as respect to this Enhancement Endorsement.

**Coverage Deductible:**
  (1) Unless otherwise stated in this Endorsement, Coverage's are subject to the Deductible shown in the Commercial Property Coverage Declarations.

1. **Arson, Vandalism and Theft Reimbursement**
   We will reimburse you for any reward you give to any person or persons other than you, your officers, your partners, your employees, or public police or fire officials, for information leading to a conviction in connection with:

   a. A fire loss to the described premises caused by arson;
   b. An actual or attempted theft or money or other Covered Property; or
   c. A vandalism loss to the described premises.

   The most we will reimburse you for rewards given under this provision is **$10,000**, or the amount of the claim for the loss described above, whichever is less, per loss and regardless of the number of persons who provided information.

2. **Brands And Labels**
   If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, but retains a salvage value, you may, at your expense:

   a. Stamp the word SALVAGE on the merchandise or its containers if the stamp will not physically damage the merchandise; or
   b. Remove the brands or labels, if doing so will not physically damage the merchandise. You must re-label the merchandise or its containers to comply with the law.

   The most we will pay for loss or damage under this Extension is **$25,000**.

3. **Business Income And Extra Expense – Actual Loss Sustained**
   a. We will pay for the actual loss of business income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of, or damage to, covered property located at the premises, which are described in the declarations. The loss or damage must be caused by or result from a covered peril. We will also pay for the actual loss of business income you sustain due to loss of or damage to, business personal property in the open which is located at the premises described in the declarations, or business personal property in a vehicle within 100 feet of the site, which is located at the premises described in the declarations.

   b. We will pay for loss of business income that occurs only within twelve consecutive months after the date of direct physical loss or damage.
   c. We will pay for ordinary payroll expenses only for 60 days following the date of direct physical loss or damage.
   d. Business income means the :
      (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred; and
      (2) Continuing normal operating expenses incurred (while "operations" are suspended), including payroll.

**Page 3**                                                                 IL 60 10 01 16
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

Ordinary payroll expenses mean payroll expenses for your employees except: Officers, Executives, Managers,

(1) Ordinary Payroll expenses include: Payroll, Special compensation such as bonuses and other incentive compensation, Employee Benefits, if directly related to payroll, FICA payments you pay, Union dues you pay, and Workers' compensation premiums.

e. We will pay necessary extra expense you incur during the "period of restoration" that you would not have incurred if there had not been no direct physical loss or damage to covered property at the premises, which are shown in the declarations. The loss or damage must be caused by or have resulted from a covered peril. We will also pay necessary extra expense you incur due to loss of or damage to business personal property in the open, which is located at the premises described in the declarations, or business personal property in a vehicle within 100 feet of the site, which is located at the premises, described in the declarations.

f. Extra Expense means expense you incurred over and above your normal operating expense during the loss period:

(1) To avoid or minimize the "suspension" of business and to continue your "operations",
   a) At the premises described in the declarations;, or
   b) At a temporary location or a new replacement premises including:
      1) Relocation expenses; and
      2) Costs to set-up and/or install furniture, fixtures, movable business equipment, needed for operation of the temporary or replacement premise.

(2) To minimize the "suspension" of business if you cannot continue "operations".

(3) We will pay any Extra Expense to: repair or replace any property, or to rent substitute equipment; or research, replace or restore the lost information on damaged "valuable papers and records"; to the extent, it reduces the amount of loss that otherwise would have been payable under this coverage.

g. We will only pay for Extra Expense that occurs within twelve consecutive months after the date of direct physical loss or damage.

4. **Valuation**
The following is added to the Building and Personal Property Coverage Form, E. Loss Conditions, 7. Valuation: g. and h. are added;

g. Finished "stock" you fabricated or manufactured, including "stock" you have sold, but not delivered, at:
(1) The selling price, as if no loss or damage had occurred.
(2) Less discounts and expenses, you otherwise would have had.

We will pay the reduction in value of the remaining parts of "stock" when the reduction is caused by direct physical loss or damage from a Covered Cause of Loss to other parts of "stock" at the described premises.

h. Personal Property of others at the amount for which you are liable, not to exceed the replacement cost or no greater than **$10,000.**

The Electronic Data Additional Coverage added on this enhancement endorsement does not apply. Electronic Data Additional Coverage is provided under Valuable Papers and Records-Cost of Research Coverage**.**

5. **Fire Extinguisher Recharge Expense:**
The following is added to the Building and Personal Property Coverage Form, A.5. Coverage Extensions.

Coverage Extensions g. is added:
g. The insurance provided by this Building and Personal Property Coverage Form applies to the cost to recharge your fire extinguishers discharged as a result of a Covered Cause of Loss. The most we will pay for loss under this coverage **$5,000.**

IL 60 10 01 16

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

6. **Fire Department Service Charge:**
The following changes Building and Personal Property Coverage Form, A.4.c. Additional Coverages.

    c.   When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to **$5,000** for your liability for fire department service charges:

7. **Newly Acquired or Constructed Property**
Newly Acquired or Constructed Property under Building and Personal Property Coverage Form, Coverage A.5.a. coverage limits are changed as follows:

    (1)  Building
         The most we will pay for loss or damage under this coverage is **$1,000,000** at each building.
    (2)  Your Business Personal Property
         The most we will pay for loss or damage under this coverage is **$500,000** at each building.

8. **Newly Acquired Locations – Business Income and Extra Expense**
    a.   This insurance applies to Business Income and Extra Expense Coverages in this endorsement that applies to newly acquired property at any location you acquire other than fairs or exhibitions.
    b.   The most we will pay under this coverage, for the sum of Business Income loss and Extra Expense incurred, is **$250,000** at each location.
    c.   Insurance under this coverage for each newly acquired location will end when any of the following first occurs:
        (1)  The policy expires;
        (2)  180 days expire after you acquire or begin to construct the property; or
        (3)  You report Values to us.
We will charge you additional premium for values reported from the date you acquire the property.

9. **Valuable Papers and Records – Cost of Research**
This insurance applies to: Building and Personal Property Coverage Extension: A.5.c. Your Business Personal Property to your costs to research, replace, or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. When Duplicates exist, we will determine the value of "Valuable Papers and Records," including those which exist on electronic or magnetic media (other than prepackaged software programs) at the cost of:

    (1)  Blank materials for reproducing the records; and
    (2)  Labor to transcribe or copy the records.

    The most we will pay for loss or damage is **$30,000** at each described premises.

The Electronic Data Additional Coverage under this enhancement endorsement does not apply. Electronic Data Additional Coverage is provided under Valuable Papers and Records-Cost of Research Coverage Extension.

10. **Property Off Premises**
Under Building and Personal Property Coverage Form, Coverage Extension A.5.d. (3) limits are increased as follows:
    The $10,000 limit for Property Off-Premises is increased to **$20,000**.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

IL 60 10 01 16

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**11. Non-Owned Detached Trailers**

Non-Owned Detached Trailers under the Building and Personal Property Coverage Extension A.5.f. is added as follows:

**f.   Non-Owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is **$10,000**, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**12. Outdoor Fences**

Under Building and Personal Property Coverage Form, Coverage Extension A.5.e. Outdoor Property is changed as follows:

e.   The insurance provided by this Coverage Form applies to your outdoor fences, including debris removal expense, caused by or resulting from any of the covered Causes of Loss.

The most we will pay for loss or damage under this Coverage is **$10,000**.

**13. Outdoor Signs**

Under Building and Personal Property Coverage Form, Coverage Extension A.5.e. Outdoor Property is changed as follows:

e.   The insurance provided by this Coverage Form applies to your outdoor signs, including debris removal expense, caused by or resulting from any of the covered Causes of Loss.

The most we will pay for loss or damage under this Coverage is **$10,000**.

**14. Outdoor Trees, Shrubs and Plants**

Under Building and Personal Property Coverage Form, Coverage Extension A.5.e. Outdoor Property is changed as follows:

e.   The insurance provided by this Coverage Form applies to your outdoor trees, shrubs and plants (other than ornamental display gardens or growing stock), including debris removal expense, caused by or resulting from any of the covered Causes of Loss.

The most we will pay for loss or damage under this Coverage is **$10,000**. Subject to a **$1,000 per item limitation**.

**15. Radio and Television Receiving Equipment**

Under Building and Personal Property Coverage Form, Coverage Extension A.5.g. Radio and Television Receiving Equipment is added as follows:

g.   The insurance provided by this Coverage Form applies to loss or damage to your radio and television antennas, satellite dishes, and similar audio/visual receiving equipment; their lead-in wiring, masts or towers, including debris removal expense, caused by or resulting from any of the Covered Causes of Loss.

The most we will pay for loss or damage under this Coverage is **$10,000**.

IL 60 10 01 16

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

16. **Refrigerated Property**

Under Building and Personal Property Coverage Form, Coverage Extension A.5.h. Refrigerated Property is added as follows:

h.   The insurance that applies to Your Business Personal Property for food spoilage resulting from utility failure to the described premises. This enhancement does not apply to food spoilage resulting from mechanical failure of your refrigeration equipment.

The most we will pay for loss or damage is **$10,000**.

17. **Ordinance or Law**

This insurance applies to Building Property, we will pay;

(1)   If a Covered Cause of Loss occurs to covered Building property, we will pay;
(a)   For loss or damage caused by enforcement of any ordinance or law that:
1)   Requires the demolition of part of the same property not damaged by a Covered Cause of Loss;
2)   Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and
3)   Is in force at the time of loss.
(b)   The increased cost to repair, rebuild or construct the property caused by enforcement of building, zoning or land use ordinance or law. If the property is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by zoning or land use ordinance or law.
(c)   The cost to demolish and clear the site of undamaged parts of the property caused by enforcement of  the building, zoning or land use ordinance or law.

(2)   However, we will not pay under this enhancement for the costs associated with the enforcement of any  ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi" wet or dry rot or bacteria; or any costs associated with the enforcement of an ordinance or law which requires   demolition, repair, replacement, reconstruction, remodeling or remediation of property due to  contamination by "pollutants", "fungi", wet or dry rot or bacteria.

**"Pollutants," means** any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

**"Fungus" means** any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents, or by-products produced or released by fungi.

(3)   We will not pay for increased construction costs under this endorsement;
(a)   Until the property is actually repaired or replaced, at that same premises or elsewhere; and
(b)   Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(4)   We will not pay more:
(a)   If the property is repaired or replaced on the same premises, than the amount you actually spend to:
1)   Demolish and clear the site; and
2)   Repair, rebuild or construct the property but not for more than property of the same height, floor area and style on the same premises.
(b)   If the property is not repaired or replaced or the same premises, than;
1)   The amount you actually spend to demolish and clear the site of the described premises; and
2)   The cost to replace, on the same premises, the damaged or destroyed property with other property:

IL 60 10 01 16

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

a) Of comparable material and quality;
b) Of the same height, floor area and style; and
c) Used for the same purpose.
(c) Than **$50,000** in any one occurrence for increased construction costs under this enhancement.
(d) Than **$50,000** in any one occurrence for demolition costs under this enhancement. The enhancement terms apply separately to each building to which this coverage applies. This coverage is subject to the deductible in the Commercial Property Coverage Declarations.

18. <u>Pollutant Clean Up And Removal</u>
Under Building and Personal Property Coverage Form, Additional Coverage A.4.d. limit is increased as follows:

The $10,000 limit for Pollutant Clean Up And Removal is increased to **$25,000.**

19. <u>Property In Transit (Including F.O.B. Shipments and Return Shipments)</u>
<u>E.1. is replaced by the following:</u>
1. The insurance provided by the Cause Of Loss-Special Form Coverage Form applies to loss of or damage to personal property used in your business, including salespersons' samples, that is in transit at your risk more than 100 feet from the described premises.

<u>E.1.a. is replaced by the following:</u>
a. We cover property shipped:
(1) By any type of carrier you do not own, lease, or operate;
(2) In or on any vehicle you own, lease, or operate;
(3) In the care, custody, or control of your salesperson.
(4) We will also pay for loss of or damage to property you ship on a F.O.B. meaning Free On Board, basis if you cannot collect the loss from the consignee. But, we will only pay the amount of your interest in the property.
(5) We will also pay for loss of or damage to property you ship which has been rejected by the consignee, or is not deliverable, while in transit being returned to you.

This enhancement does not apply to "installation property".

**"Installation property" means** property of others for which you are liable or in which you have an interest, which is intended for installation, such as, but not limited to, materials, supplies, fixtures, machinery and equipment, and including labor or services furnished in connection with the installation.

c. The most we will pay for loss or damage is **$25,000.**

20. <u>BackUp Of Sewers And Drains</u>
This coverage under the Cause Of Loss-Special Form to apply to direct physical damage and actual loss of Business Income you sustain or necessary Extra Expense you incur caused by water and water-borne materials that back up from a sewer or drain.

Causes Of Loss – Basic Form Exclusions B.1.g.(3) and Causes Of Loss – Special Form B.2.d.(2), (7) (a) & (b), do not apply to Backup Sewer and Drain Coverage on this endorsement.

The most we will pay for loss or damage is **$25,000**. A standard **$250** deductible applies to each building.

21. <u>Contractors' Tools and Equipment</u>
Your Business Personal Property Coverage applies to contractor's tools and equipment as follows:
a. We will cover the following property for any of the Covered Causes of Loss:

(1) The most we will pay for your unscheduled communication equipment, not permanently installed, including cellular telephones and communication radios, communication equipment resulting from one occurrence is **$5,000** after a deductible of **$250** is applied to the loss.
(2) Your unscheduled tools and unscheduled tools owned by your employees.
(a) The most we will pay for any one occurrence is **$5,000** after a deductible of **$250** is applied to the loss.

**Page 8**                                                                                     IL 60 10 01 16

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

    (b)  The most we will pay is a **$1,000** for loss or damage caused by theft of tools, after a **$500** deductible is applied to the loss, while left unattended in any locked vehicle or attached locked tool bin.

    (c)  We will not pay for loss or damage caused by theft of tools while left unattended in or on any vehicle, if tools are unlocked inside the vehicle, or attached tool bin and there is no evidence of forced entry.

(3)  The most we will pay is $**5,000** for unscheduled contractors' equipment of others rented or leased to you and in your care, custody, or control, or at a job site.

## 22. Accounts Receivable

a.  The insurance provided by this endorsement is to cover loss at the described premises for:

(1)  All amounts due from your customers that you are unable to collect;

(2)  Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(3)  Collection expenses in excess of your normal collection expenses that are made necessary by the loss; and

(4)  Others reasonable expenses that you incur to reestablish your records of accounts receivable; that  result from Covered Causes of Loss to your records of accounts receivable.

b.  If you give us written notice within 10 days of removal of your records of accounts receivable because of   imminent danger of loss, we will pay for loss while they are:

(1)  At a safe place away from your described premises:

(2)  Being taken to and returned from that place.

The most we will pay for loss or damage is **$25,000**

## 23. Claim Data Expense

The insurance provided by this endorsement applies to the expense you incur in preparing claim data when required by us. This includes the cost of taking inventories, making appraisals, and preparing other documentation to show the extent of loss.

The most we will pay for preparation of claim data is **$25,000.** We will not pay for any expenses billed by and payable to insurance adjusters or attorneys or any costs as provided in: Building And Personal Property Coverage Form, E. Loss Conditions, 2. Appraisal.

The most we will pay for loss is **$25,000**.

## 24. Computers And Media

This insurance applies to your Business Personal Property A.1.b.: Direct loss or damage to computer "equipment" and replaceable "media" that you own, lease, rent, or for which you are otherwise legally responsible.

(8)  **"Equipment" means** a network of machine components that accepts information, processes it according to a plan, and produces a desired result. This includes programmable electronic devices that can store, retrieve, and process data and associated peripheral devices that provide communication, including input and output functions such as printing, or auxiliary functions such as   data transmission.

(9)  **"Media" means** the material on which data is recorded, such as magnetic tapes, internal and external hard discs, and flash drive. This includes the data stored on the media. Any data stored on The Cloud is excluded.

This coverage applies to property located anywhere in the coverage territory.
The coverage is subject to the deductible on the Commercial Property Coverage Declarations.

The most we will pay for loss or damage is **$25,000.**

## 25. Fine Arts

The insurance that is provided by this coverage applies to paintings, etchings, pictures, tapestries and any other bona fide works of art with rarity or historical value caused by or resulting from any Covered Causes of Loss.

The most we will pay for loss or damage for this coverage is **$25,000**.

                                  IL 60 10 01 16

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

26. **Installation Property**
The insurance provided by this coverage applies to "Installation Property"
   a. While on the "job site"
   b. While at any temporary storage location you do not own, lease or operate; or
   c. While in transit.

   A **$250** deductible is subject to each covered loss.

   For this coverage, **"job site" means** the premises where you or subcontractors working on your behalf are currently performing operations, and where the "installation property" will be permanently located at the completion of the construction, erection, fabrication, or installation.

   The most we will pay for loss or damage for this coverage is **$25,000**.

27. **Employee Theft**
We will pay up to **$25,000** in any one "occurrence" for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" including forgery committed by an "employee". "Theft" shall also include forgery.

   **This Supplemental Coverage does not cover loss resulting from:**
   a. Acts committed by you, your partners, or "members," whether acting alone or in collusion with other persons.
   b. Acts of "employees" learned of by you, your partners, "members," "managers," officers, directors or trustees not in collusion with the "employee," prior to the policy period shown in the Declarations.
   c. The unauthorized disclosure of your confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists.
   d. The unauthorized use or disclosure of confidential information of another person or entity which is held by you including, but not limited to financial information, personal information, credit card information or similar non-public information.
   e. Indirect loss as a result of an "occurrence" including, but not limited to loss resulting from:
      (1) Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".
      (2) Payment of damages of any type for which you are legally liable. But, we pay compensatory damages arising directly from a loss covered under this supplementary coverage.
      (3) Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this supplementary coverage.
   f. Fees, costs and expenses incurred by you which are related to any legal action.
   g. Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:
      (1) An inventory computation; or
      (2) A profit and loss computation.
   h. Trading, whether in your name or in a genuine or fictitious account.
   i. The fraudulent or dishonest signing, issuing, canceling, or failing to cancel a warehouse receipt or any papers connected with it.

   **Duties in the Event of Loss**
   After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:
   a. Notify us as soon as possible.
   b. Submit to examination under oath at our request and give us a signed statement of your answers.
   c. Produce for our examination all pertinent records.
   d. Give us a detailed, sworn proof of loss within 120 days.
   e. Cooperate with us in the investigation and settlement of any claim.

   **Limits of Insurance Under This Supplemental Coverage**
   The most we will pay for all losses resulting directly from an "occurrence" is the applicable limit shown in the Summary Of Coverage.

   If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the largest limit available under any one of those Insuring Agreements or Coverages.

IL 60 10 01 16
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

<u>Loss Sustained During Prior Insurance Issued By Us Or Any Affiliate</u>
   a**.** **Loss Sustained Partly During This Insurance And Partly During Prior Insurance**

If you "discover" a loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place:

(1) Partly during the Policy Period shown in the Declarations; and
(2) Partly during the Policy Period (s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest; and this insurance became effective at the time of cancellation of the prior insurance, we will first settle the amount of loss that you sustained during this Policy Period. We will then settle the remaining amount of loss that you sustained during the Policy Period(s) of the prior insurance.

<u>Legal Action Against Us</u>
You may not bring any legal action against us involving a loss under this Supplemental Coverage:
(1) Unless you have complied with all the terms of this insurance;
(2) Until 90 days after you have filed proof of loss with us; and
(3) Unless brought within 3 years from the date you "discovered" the loss.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

28. <u>Computer Fraud</u>
We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":
   a. To a person (other than a "messenger") outside those "premises"; or
   b. To a place outside those "premises".

<u>Exclusions:</u>

● **Computer Fraud does not cover;**
   a. Credit Card Transactions Loss resulting from the use or purported use of credit, debit, change, access, convenience, identification, stored-value or other cards or the information contained on such cards.
   b. Funds Transfer Fraud

   Loss resulting from a "fraudulent instructions" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

   The most we will pay for loss or damage under this coverage is **$25,000**.

29. <u>Lock Replacement Coverage</u>
The insurance provided by this coverage applies to replacement of locks necessitated by the "theft" of keys to your "premises".
   The most we will pay for loss is **$5,000**.

30. <u>Money, Securities And Stamps</u>
The most we will pay for loss or damage is:
   a. **$5,000** per occurrence for "money", "securities" and stamps while located at the described "premises"; and
   b. **$5,000** per occurrence for "money", "securities" and stamps while being conveyed outside the described "premises" by you, your officers, your  partners or your "employees".

The insurance provided by this coverage applies to loss or damage to "money", "securities", and stamps.

31. <u>Electronic Data</u>

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of  the media on which the electronic data was stored, with blank media of substantially identical type.

IL 60 10 01 16
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

(3) The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

   (a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

   (b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

   (c) If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

   (d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected,  designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, Electronic Data, is **$2,500** for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

## DEFINITIONS

- **"Banking premises"** means the interior of that portion of any building occupied by a banking institution or similar safe depository.

- **"Discover" or "discovered" means** the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

- **"Discover" or "discovered" also means** the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this insurance.

- **"Employee":**
  a. **"Employee" means:**
   (1) Any natural person:
      (a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by the "employee";
      (b) Who you compensate directly by salary, wages or commissions; and
      (c) Who you have the right to direct and control while performing services for you;
   (2) Any natural person who is furnished temporarily to you:
      (a) To substitute for a permanent "employee" as defined in Paragraph a.(1), who is on leave; or
      (b) To meet seasonal or short-term work load conditions; while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";
   (3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph a.(2);
   (4) Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained as a consultant while performing services for you;
   (5) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the "premises";

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

(6) Any "employee" of an entity merged or consolidated with you prior to the effective date of this policy; or

(7) Any of your "managers", directors or trustees while:

    (a) Performing acts within the scope of the usual duties of an "employee"; or

    (b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

b. **"Employee" does not mean**:

    Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph 5.a.

- **"Fraudulent instructions" means**:

a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

b. A written instruction issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee", but which was in fact fraudulently transmitted by someone else without your knowledge or consent or the "employee's" knowledge or consent.

- **"Funds" means "**money" and "securities".

- **"Fungus" means** any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

- **"Fungi" means** comprising all the <u>fungus</u> groups and sometimes also the slime molds.

- **"Installation property" means** property of others for which you are liable or in which you have an interest, which is intended for installation, such as, but not limited to, materials, supplies, fixtures, machinery and equipment, and including labor or services furnished in connection with the installation.

- **"Jobsite" means** the premises where you or subcontractors working on your behalf are currently performing operations and where the "installation property" will be permanently located at the completion of the construction, erection, fabrication, or installation.

- **"Manager" means** a natural person serving in a directorial capacity for a limited liability company.

- **"Messenger" means** you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

- **"Member" means** an owner of a limited liability company represented by its membership interest, who also may serve as a "manager"

- **"Money" means** currency, coins and bank notes in current use and having a face value and travelers checks, register checks and money orders held for sale to the public.

- **"Occurrence" means:**

a. Under Insuring Agreement A.2.:

    (1) An individual act;

    (2) The combined total of all separate acts whether or not related; or

    (3) A series of acts whether or not related; committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period.

- **"Operations" means:**

a. Your business activities occurring at the described premises: and

b. The ability for a tenant to occupy the described premises.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

- **"Other Property" means** any tangible property other than "money" and "securities" that has intrinsic value. "Other Property" does not include computer programs, electronic data, or any property specifically excluded under this insurance.

- **"Period of Restoration" means** the period of time that:
  a. Begins immediately after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; And
  b. Ends on the earlier of:
     (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
     (2) The date when business is resumed at a new permanent location.
  "Period of Restoration" does not include any increased period required due to enforcement of any ordinance or law that:
  a. Regulates the construction, use or repair, or requires the tearing down of any property; or
  b. Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".
  The expiration date of the policy will not cut short the "period of restoration".

- **"Pollutants" means** any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor,soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

- **"Premises" means** the interior of that portion of any building you occupy in conducting your business.

- **"Rental Value" means** Business Income that consists of:
  a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and
  b. Continuing normal operating expenses incurred in connection with that premises, including:
     (1) Payroll; and
     (2) The amount of charges, which is the legal obligation of the tenant(s) but would otherwise be your obligations.

- **"Securities" means** negotiable and non-negotiable instruments or contracts representing either "money" or property and includes;
  a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and
  b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you; but does not include "money".

- **"Stock" means** merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

- **"Suspension" means:**
  a. The slowdown or cessation of your business activities; or
  b. That a part or all of the described premises is rendered un-occupiable if coverage for Business Income including "Rental Value" or "Rental Value" applies.

- **"Theft" means** the unlawful taking of property to the deprivation of the insured.

- **"Transfer account" means** an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds"

- **"Valuable papers and records" means** inscribed, printed or written documents,manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages. But "valuable papers and records" does not mean "money" or "securities", converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

The **CAUSE OF LOSS – SPECIAL FORM CP 10 30 –** is changed as follows:

**B. EXCLUSIONS**

**The following exclusions:**
- **Earth Movement, B.1.b.;**
- **Smoke, vapor or gas from agricultural smudging or industrial operations, B.2.c.;**
- **Explosion of steam boilers, steam pipes, steam engines or steam turbines owned by you, etc., B.2.e.;**
- **Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more B.2.f.**
- **Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment, B.2.g.;**
- **Rain, snow, ice or sleet to personal property in the open, B.2.j.**

**The above exclusions do not apply to the following on this enhancement endorsement:**
- **Valuable Papers and Records-Cost of Research;**
- **Accounts Receivable;**
- **Computers and Media;**
- **Property in Transit;**
- **Fine Arts;**
- **Installation Property.**

**The following Exclusions do not apply to Computers and Media on this enhancement endorsement:**
- **Utility Services, B.1.e.;**
- **Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires, B.2.a.;**
- **Faulty, inadequate or defective planning, B.3.c.**

IL 60 10 01 16

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**EXHIBIT C**

ELECTRONICALLY FILED - 2021 Feb 17 3:35 PM - JASPER - COMMON PLEAS - CASE#2021CP2700409

| | |
|---|---|
| STATE OF SOUTH CAROLINA )<br><br>COUNTY OF JASPER )<br><br>MARK W. McGILTON, )<br>    )<br>    Plaintiff, )<br>    )<br>    v. )<br>    )<br>1223 MAY RIVER ROAD, LLC; )<br>D.R. HORTON, INC.; and, LOTTY )<br>TRUCKING LLC f/k/a RAMOS )<br>TRUCKING, LLC, )<br>    )<br>    Defendants. ) | IN THE COURT OF COMMON PLEAS<br>FOURTEENTH JUDICIAL CIRCUIT<br>CASE NO. 2021-CP-27-<br><br><br><br><br>**SUMMONS**<br><br>**JURY TRIAL DEMANDED** |

TO: THE DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED AND REQUIRED to answer the Complaint in this action, a copy of which is hereby served upon you, and to serve a copy of your Answer to the said Complaint on the subscriber at his office, Post Office Box 21069, Hilton Head Island, South Carolina 29925, within thirty (30) days after service thereof, exclusive of the day of such service, and if you fail to appear and defend against the said action then judgment by default will be rendered against you for the relief demanded in the Complaint.

/s/Benjamin T. Shelton
SHELTON LAW FIRM, LLC
P.O. Box 21069
Hilton Head Island, SC 29925
(843) 802-0087
ben@sheltonlawsc.com

February 17, 2021
Hilton Head Island, South Carolina

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
) FOURTEENTH JUDICIAL CIRCUIT
COUNTY OF JASPER ) CASE NO. 2021-CP-27-

MARK W. McGILTON, )
)
Plaintiff, )
) COMPLAINT
v. )
) **JURY TRIAL DEMANDED**
1223 MAY RIVER ROAD, LLC, )
D.R. HORTON, INC., and, LOTTY )
TRUCKING, LLC f/k/a RAMOS )
TRUCKING, LLC, )
)
Defendants. )

The Plaintiff, by and through the undersigned attorney, comes now in a Complaint against the above referenced Defendants, to show:

PREAMBLE

On March 13, 2018, the Plaintiff, Mr. Mark W. McGilton, was lawfully operating his vehicle on May River Rd. in or about Bluffton, South Carolina. At no fault of the Plaintiff, a dump truck driver, operating unlawfully and engaged together with the Defendants for their mutual benefit and with a common purpose of hauling dirt from one project site to another, crossed the center line and caused a head-on collision resulting in devastating permanent injury and damages to the Plaintiff.

JURISDICTION AND VENUE

1.     Plaintiff is a citizen and resident of Beaufort County, South Carolina.

2.     Plaintiff incorporates the preamble as if repeated herein.

**Page 1 of 14**

ELECTRONICALLY FILED - 2025 Feb 20 3:35 PM - JASPER - COMMON PLEAS - CASE#2025CP2700069

3.      Defendant Lotty Trucking LLC f/k/a Ramos Trucking, LLC (herein, "*Ramos Trucking*") is a South Carolina limited liability company that at all relevant times maintained a principal place of business in Ridgeland, in Jasper County, South Carolina. Upon information and belief, Ramos Trucking garaged, kept, and/or maintained and did provide maintenance, parts, and labor to the maintenance of the dump truck operated by the dump truck driver before, at or around the time of the accident at issue in this matter. At all relevant times Ramos Trucking held a duty to third parties, including the Plaintiff, to reasonably perform services, provide reasonable parts for, and reasonably maintain the dump truck at issue in this matter.

4.      Defendant 1223 May River Road, LLC (herein, "*1223 May River*") is a South Carolina limited liability company and is the owner and developer of a commercial real estate development located at 1223 May River Road, Bluffton, SC 29910, with its principal place of business in Beaufort County, South Carolina.  1223 May River held, shared, or assumed certain duties and obligations to third parties, including the Plaintiff, while carrying out its business at and development of 1223 May River Road.

5.      D.R. Horton, Inc. (herein, "*D.R. Horton*") is a foreign corporation doing business throughout South Carolina.  It is now and was a at all relevant times herein the builder and developer of a community known as Cypress Ridge, located at 210 Hulston Landing Rd, Bluffton, SC  29909 (a project hereinafter referenced as, "*Cypress Ridge*"). D.R. Horton held, shared, or assumed certain duties and obligations to third parties,

including the Plaintiff, while carrying out its business at and development of Cypress Ridge.

6.      Jurisdiction and venue are proper in this Court.

### FACTS

7.      At all relevant times herein, 1223 May River engaged with, and exercised control, responsibility and a shared a financial interest with Kenneth Scott Builders, Inc. (hereinafter, "Kenneth Scott") and Kenneth Scott's employee, servant and agent, Jacob-AU Trucking, LLC (herein, "Jacob-AU") and Alfredo Uriostegui (Kenneth Scott, Jacob-AU and Alfredo Uriostequi, hereinafter collectively referenced as the "Dump Truck Operator") in a relationship comprised of common interests for the common purpose of (among other things) the development and construction of 1223 May River Rd., and profited from the same.

8.      At all relevant times, D.R. Horton engaged with, and exercised control, responsibility and a shared financial interest with the Dump Truck Operator in a relationship comprised of common interests for the common purpose of (among other things) the development and construction of Cypress Ridge, and profited from the same.

9.      On or about March 13, 2018, Plaintiff was operating his vehicle on May River Road in Bluffton, Beaufort County, South Carolina. The Dump Truck Operator was traveling in the opposite direction on May River Road.  Said dump truck, unable to stop with brakes, crossed the centerline in effort to avoid colliding with a vehicle in the dump

ELECTRONICALLY FILED - 2021 Feb 10 3:35 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069

ELECTRONICALLY FILED - 2025 Feb 20 3:35 PM - JASPER - COMMON PLEAS - CASE#2025CP2700069

truck's lane of traffic, and collided with Plaintiff in a head-on collision. At approximately 45 miles per hour. The Plaintiff's vehicle was destroyed. The Plaintiff suffered millions of dollars of medical bills and painful permanent injuries as a result of the collision.

10.    Shortly prior to the collision, the dump truck was being operated for the mutual benefit of the Dump Truck Operator, 1223 May River, and D.R. Horton, loading dirt at Cypress Ridge and hauling it to be dumped at 1223 May River.

11.    Immediately before the collision, the dump truck was operated for the mutual benefit of the Dump Truck Operator, 1223 May River, and D.R. Horton, returning dumping dirt from Cypress Ridge at 1223 May River Rd., acting in furtherance of the common purpose.

12.    At the time of the accident, the Dump Truck Operator was driving the dump truck from 1223 May River Rd. and returning to Cypress Ridge to load more fill dirt to be returned to, and dumped at, 1223 May River Rd., furthering the common purpose of hauling dirt shared by it, 1223 May River, and, D.R. Horton.

13.    At the time of the collision, the dump truck at issue was controlled, operated, managed, engaged and/or utilized by D.R. Horton, 1223 May River, and the Dump Truck Operator for their shared, common interest and profit, for the common purpose of the development of 1223 May River and Cypress Ridge, and in hauling goods (i.e. dirt) for compensation over the public roadways of South Carolina, which was the very purpose that the respective relationships between them were established.

ELECTRONICALLY FILED - 2025 Feb 20 3:35 PM - JASPER - COMMON PLEAS - CASE#2025CP2700069

14.     Defendants negligently owned, leased, supplied, entrusted, contracted, directed, operated, controlled, and/or maintained the dump truck, thereby causing the dump truck to strike Plaintiff's vehicle.

15.     Defendants negligently hired, provided, supplied, trained, and/or instructed the dump truck driver in the safe use and operation of the dump truck.

16.     At the time of the collision, the dump truck driven by the Dump Truck Operator had several maintenance violations, including those related to brakes, in violation of law.

17.     The dump truck that collided with the Plaintiff failed to maintain certain mandatory contracts, in violation of law.

18.     The dump truck involved in the accident with Plaintiff constituted an unlawful public safety hazard and/or a dangerous instrument.

19.     D.R. Horton and 1223 May River each held certain responsibilities and duties to the Plaintiff to reasonably supervise and control work arising from premises they owned, their projects, jobsites, and/or premises over which they controlled.

20.     D.R. Horton and 1223 May River each held certain responsibilities and duties to the Plaintiff to reasonably ensure that work done at their projects on premises that they owned or controlled was lawfully performed.

21.     D.R. Horton and 1223 May River each held duties to the Plaintiff to reasonably supervise their projects and reasonably prevent unlawful public safety

ELECTRONICALLY FILED - 2023 Feb 20 3:35 PM - JASPER - COMMON PLEAS - CASE#2023CP2700069

hazards and/or dangerous instruments from performing work at locations they owned and/or at their projects.

22.    Defendant Ramos Trucking held a duty to provide reasonable services, commercially reasonable parts, and maintenance to the dump truck operated by Dump Truck Operator. Defendant Ramos Trucking breached these duties. It was foreseeable that its breach of duties would cause serious injury to third parties operating vehicles on public highways, including the Plaintiff.

23.    Additionally, the Defendants owed Plaintiff a statutory and common law duty of care.

24.    That Defendants breached said duties as outlined herein.

FOR A FIRST CAUSE OF ACTION
(Negligent Maintenance – Garage Liability)
(As to Defendant Lotty Trucking, LLC)

25.    The Plaintiff repeats all preceding paragraphs of this Complaint as if fully restated verbatim herein.

26.    Defendant Lotty Trucking LLC f/k/a Ramos Trucking, LLC, (herein, *"Ramos Trucking"*) upon information and belief, garaged and/or stored the dump truck in question, and performed maintenance and/or supplied parts to the dump truck that collided with the Plaintiff.

27.    Ramos Trucking's principal place of business where the dump truck was stored and garaged was at all relevant times in Jasper County, South Carolina.

ELECTRONICALLY FILED - 2025 Feb 20 3:35 PM - JASPER - COMMON PLEAS - CASE#2025CP2700069

28.     Upon information and belief, the dump truck driver paid or otherwise provided consideration to Ramos Trucking for the storage and maintenance of the dump truck.

29.     Ramos Trucking owed all foreseeable third parties, including the Plaintiff, a duty to exercise reasonable care in the maintenance of the dump truck.

30.     Ramos Trucking owed the Plaintiff a duty to exercise reasonable care in supplying parts to the dump truck.

31.     Upon information and belief, Ramos Trucking breached these duties of care owed to the Plaintiff.  The failure by Ramos Trucking to exercise reasonable care caused and/or contributed to the dump truck operating as a dangerous instrument and public safety hazard, thereby causing the collision and injuries to the Plaintiff.

32.     Specifically, at the time of the accident, the dump truck had maintenance violations relating to brake performance, including but not limited to several loose and/or improperly connected slack adjusters, loose brake chamber, several kinked brake hoses, oil covered brake pads, a leaking brake seal, improper brake hose connections, unmaintained push rods, and loose bolts.

33.     Upon information and belief, on or about March 13, 2018, the operator of the dump truck unlawfully swerved into oncoming traffic and head-on into the Plaintiff, when the over 25,000lb dump truck's brakes malfunctioned and/or knowing or believing

ELECTRONICALLY FILED - 2025 Feb 20 3:45 PM - JASPER - COMMON PLEAS - CASE#2025CP2700069

that the dump truck's brakes would malfunction, in effort to avoid colliding with a slowing or stopped vehicle in their lane of traffic.

34.    In addition, upon information and belief, as stated above, the operator of the dump truck, Jacob-AU and Alfredo Uriostegui, and, Ramos Trucking shared a financial interest in the operator of the dump truck's hauling operations.

35.    As a direct and proximate result of Ramos Trucking's acts or omissions, which were negligent, grossly negligent, reckless and wanton, the Plaintiff suffered injuries and damages in an amount to be shown at the trial of the matter.

36.    The Plaintiff prays for a judgment against Ramos Trucking for actual and consequential damages, and for a reasonable amount of punitive damages in an amount to be determined by the jury at the trial of the matter.

### FOR A SECOND CAUSE OF ACTION
(Gross Negligence/Negligence as to D.R. Horton and 1223 May River Road)
(Joint Enterprise Liability)

37.    Plaintiff repeats the preceding paragraphs if this Complaint as if fully restated verbatim herein.

38.    At all relevant times herein, Defendant D.R. Horton and 1223 May River Road were engaged in a joint enterprise with the Dump Truck Operator relative to the development of their respective projects and in the hauling of dirt from one project to the other.

ELECTRONICALLY FILED - 2025 Feb 20 3:45 PM - JASPER - COMMON PLEAS - CASE#2025CP2700969

39.     The accident and injuries described herein were caused by the Dump Truck Operator while it acted in furtherance of the joint enterprise of D.R. Horton and the Dump Truck Operator of the development of the Cypress Ridge project, and, in while engaged in the joint enterprise of hauling dirt from Cypress Ridge project during the project's construction and development.

40.     The accident and injuries described herein were caused by the Dump Truck Operator while it acted in furtherance of the joint enterprise of 1223 May River and the Dump Truck Operator of the development of the 1223 May River project, and while engaged in the joint enterprise of hauling dirt to the 1223 May River Rd. project during its construction and development.

41.     While engaged in and in furtherance of its the joint enterprise with D.R. Horton, the Dump Truck Operator was negligent, grossly negligent, reckless and wanton in the operation and maintenance of the Dump Truck.

42.     While engaged in and in furtherance of its joint enterprise with 1223 May River, the Dump Truck Operator was negligent, grossly negligent, reckless and wanton in the operation and maintenance of the Dump Truck.

43.     The dump truck was operated in violation of law.

44.     Upon information and belief, at all relevant times of their joint enterprise, Defendants were unlawfully operating as a motor carrier.

ELECTRONICALLY FILED - 2023 Feb 20 3:35 PM - JASPER - COMMON PLEAS - CASE#2025CP2700069

45.     Defendant 1223 May River and D.R. Horton and the Dump Truck Operator are jointly and severally liable for all acts and/or omissions in furtherance of their joint enterprises.

46.     That Defendants were negligent, negligent per se, careless, reckless, grossly negligent, willful, and wanton at the time and place above mentioned in the following particulars:

      a.     in operating a motor vehicle, a dangerous instrumentality, in an unsafe manner;

      b.     in traveling too fast for conditions;

      c.     in failing to maintain the proper lane of travel;

      d.     in failing to yield the right of way;

      e.     in operating a dump truck with multiple safety violations;

      f.     in operating a dump truck with inadequate brakes;

      g.     in failing to properly maintain the dump truck;

      h.     in failing to properly inspect the dump truck;

      i.     in failing to keep the dump truck under proper control;

      j.     in making an unsafe maneuver;

      k.     in failing to supervise work done at premises they own, operate and/or managed;

      l.     in failing to ensure work done at premises they owned, operated and or maintained was done lawfully;

      m.     in allowing an illegal, dangerous instrument from performing work at their premises;

      n.     in failing to supervise servants, agents, and/or employees;

o.     in failing to use the degree of care and caution that a reasonable and prudent person would have exercised under the same or similar circumstances; and

p.     in such other and further particulars as the evidence in trial may show;

all of which combined and concurred as a direct and proximate cause of the injuries and damages suffered by Plaintiff herein, said acts being in violation of the statute and common laws of the State of South Carolina.

47.     The Plaintiff, in addition to actual and consequential damages, is entitled to a reasonable award of punitive damages in an amount to be determined by the jury at the trial of the case.

FOR A THIRD CAUSE OF ACTION
(Negligent Entrustment)
As to D.R. Horton and 1223 May River Rd.

48.     The Plaintiff restates the preceding paragraphs of this Complaint as if fully repeated verbatim herein.

49.     The Defendants D.R. Horton and 1223 May River Rd. held a duty to the Plaintiff to exercise reasonable care in entrusting the Dump Truck Operator to haul dirt to and/or from their respective projects.

50.     The Defendants D.R. Horton and 1223 May River Rd. knew or reasonably should have known that the operations of the dump truck involve a danger to the public and require mandatory licenses, mandatory safety requirements, and/or other mandatory financial requirements.

51.     Defendants D.R. Horton and 1223 May River Rd. knew, or should have known, that the Dump Truck Operator was operating in violation of law and was unfit to transport goods for hire within South Carolina.

ELECTRONICALLY FILED - 2025 Feb 20 3:45 PM - JASPER - COMMON PLEAS - CASE#2025CP2700069

52.     By entrusting Dump Truck Operator with the dangerous loads and operations to and from their projects, the Defendants D.R. Horton and 1223 May River Rd. breached duties of care owed to the Plaintiff.

53.     As a direct and proximate result, the Plaintiff suffered injuries and damages.

54.     The acts and omissions by Defendants D.R. Horton and 1223 May River Rd. were grossly negligent, reckless and wanton, and the Plaintiff is entitled to an award of punitive damages in a reasonably amount to be determined by the jury at trial.

## FOR A FOURTH CAUSE OF ACTION
### (Vicarious Liability)
### (as to D.R. Horton and 1223 May River Rd.)

55.     The Plaintiff restates the preceding paragraphs of this Complaint as if fully repeated verbatim herein.

56.     At all relevant times, the Dump Truck Operator was acting as an agent, servant, or employee of the Defendants at the direction and control of the Defendants within the scope of such agency, service and/or employment.

57.     The Defendants D.R. Horton and 1223 May River Rd. are jointly and severally liable for the acts and omissions of their agent, servant, and/or employee.

58.     As a direct and proximate result of the Dump Truck Operator's acts or omissions, the Plaintiff suffered injuries and damages.

59.     The acts and omissions of the Defendants were negligent, grossly negligent, reckless and wanton, and the Plaintiff is entitled to an award of punitive damages in a reasonably amount to be determined by the jury at trial.

ELECTRONICALLY FILED - 2023 Feb 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2023CP2700069

ELECTRONICALLY FILED - 2025 Feb 27 3:45 PM - JASPER - COMMON PLEAS - CASE#2025CP2700099

### FOR A FIFTH CAUSE OF ACTION
(Negligent Selection)
(As to D.R. Horton and 1223 May River Rd.)

60.     The Plaintiff repeats the preceding paragraphs of this Complaint as if fully restated verbatim herein.

61.     D.R. Horton and 1223 May River Rd. held a duty to the Plaintiff to exercise reasonable care to engage and/or employ a competent and careful dump truck operator for its respective projects.

62.     D.R. Horton and 1223 May River Rd. knew or should have known that the Dump Truck Operator operated unlawfully, failed to lawfully maintain its vehicle, failed to reasonably inspect its vehicle, and otherwise failed to comply with mandatory requirements of South Carolina law.

63.     D.R. Horton and 1223 May River Rd. failed to exercise reasonable care in choosing, hiring, selecting, maintaining, engaging, and/or supervising the Dump Truck Operator relative to operations on or material hauled to and from their projects.

64.     The Plaintiffs injuries would not have happened but for the Defendants' negligent selection of the Dump Truck Operator.

65.     As a direct and proximate result of D.R. Horton and 1223 May River Rd. failing to exercise reasonable care in the selection of the Dump Truck Operator, the Plaintiff suffered injuries and damages.  Further the Defendants acts were grossly

negligent, reckless and wanton and the Plaintiff is entitled to a reasonable award of punitive damages to be determined at the trial of the matter.

WHEREFORE, Plaintiff prays for an award against the Defendants for actual and punitive damages in an amount to be determined by the jury at the trial of the case, costs and attorney's fees.

SHELTON LAW FIRM, LLC

/s/ Benjamin T. Shelton
ATTORNEY FOR PLAINTIFF
SC Bar No. 77207
P.O. Box 21069
Hilton Head Island, SC  29925
(843) 802-0087
ben@sheltonlawsc.com

Hilton Head Island, South Carolina
February 17, 2021

ELECTRONICALLY FILED - 2023 Feb 20 3:45 PM - JASPER - COMMON PLEAS - CASE#2025CP2700099

**EXHIBIT D**

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF JASPER | )<br>)<br>) | IN THE COURT OF COMMON PLEAS<br>C.A. NO.: 2021-CP-27-00069 |
| Mark W. McGilton, | )<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>)<br>) | |
| 1223 May River Road, LLC;<br>D.R. Horton, Inc.; and Lotty Trucking, LLC<br>f/k/a Ramos Trucking, LLC, | )<br>)<br>)<br>) | |
| Defendants. | )<br>)<br>) | |
| 1223 May River Road, LLC, | )<br>)<br>) | |
| Third-Party Plaintiff, | )<br>) | |
| v. | )<br>) | **SUMMONS TO THIRD-PARTY**<br>**COMPLAINT** |
| Kenneth Scott Builders, LLC, | )<br>) | |
| Third-Party Defendant. | )<br>)<br>) | |
| D.R. Horton, Inc., | )<br>)<br>) | |
| Third-Party Plaintiff, | )<br>) | |
| v. | )<br>) | |
| Kenneth Scott Builders, LLC, | )<br>) | |
| Third-Party Defendant. | )<br>)<br>) | |

**TO:   THIRD-PARTY DEFENDANT KENNETH SCOTT BUILDERS, LLC AND ITS COUNSEL OF RECORD STEPHEN L. BROWN, ESQUIRE AND STEPHEN A. GRIFFITH, JR., ESQUIRE:**

**YOU ARE HEREBY SUMMONED** and required to answer the Third-Party Complaint contained in the Amended Answer of D.R. Horton, Inc., to Plaintiff's Complaint in this action, a

Page **1** of **18**

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

copy of which is hereby served upon you, and to serve a copy of your Answer to said Third-Party Complaint on the subscriber hereto at this office at 704 East McBee Avenue, Greenville, South Carolina, 29601, within thirty (30) days after service hereof, exclusive of the day of such service; and if you fail to answer the Third-Party Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Third-Party Complaint.

**KENISON, DUDLEY & CRAWFORD, LLC**

*s/ Jason M. Imhoff*
John T. Crawford Jr. (SC Bar # 69682)
Jason Imhoff (S.C. Bar # 69355)
704 E. McBee Ave.
Greenville, SC 29601
(864) 242-4899
(864) 242-4844 (fax)
Crawford@conlaw.com
Imhoff@conlaw.com
*Attorneys for Defendant D.R. Horton, Inc.*

October 26, 2022

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF JASPER | ) IN THE COURT OF COMMON PLEAS<br>) C.A. NO.: 2021-CP-27-00069<br>) |
| Mark W. McGilton, | ) |
| Plaintiff, | ) |
| v. | ) |
| 1223 May River Road, LLC;<br>D.R. Horton, Inc.; and Lotty Trucking, LLC<br>f/k/a Ramos Trucking, LLC, | ) |
| Defendants. | ) |
| 1223 May River Road, LLC, | ) |
| Third-Party Plaintiff, | ) |
| v. | ) **D.R. HORTON, INC.'S AMENDED** |
| Kenneth Scott Builders, LLC, | ) **ANSWER AND THIRD-PARTY**<br>) **COMPLAINT** |
| Third-Party Defendant. | ) |
| D.R. Horton, Inc., | ) |
| Third-Party Plaintiff, | ) |
| v. | ) |
| Kenneth Scott Builders, LLC, | ) |
| Third-Party Defendant. | ) |

**TO:    THIRD-PARTY DEFENDANT KENNETH SCOTT BUILDERS, LLC AND ITS COUNSEL OF RECORD STEPHEN L. BROWN, ESQUIRE AND STEPHEN A. GRIFFITH, JR., ESQUIRE:**

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

Pursuant to Rule 15, SCRCP, Defendant D.R. Horton, Inc. (hereinafter "Defendant" or "D.R. Horton"), hereby amends its answer and asserts a Third-Party Complaint and answers the Complaint of Plaintiff, Mark W. McGilton ("Plaintiff"), as set forth below by denying each and every allegation not hereinafter specifically admitted, demanding strict proof thereof, and further respond as follows:

Each and every allegation set forth in Plaintiff's Complaint, not expressly admitted herein, is hereby denied.

**FOR A FIRST DEFENSE**
**(Answer to Complaint)**

1.      D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 1 of Plaintiff's Complaint, and therefore denies the same.

2.      D.R. Horton denies the allegations contained in Paragraph 2 of Plaintiff's Complaint.

3.      D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 3 of Plaintiff's Complaint, and therefore denies the same.

4.      D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 4 of Plaintiff's Complaint, and therefore denies the same.

5.      D.R. Horton admits so much of Paragraph 5 of Plaintiff's Complaint as alleges that D.R. Horton was a builder in Cypress Ridge community. D.R. Horton denies the remaining allegations contained in Paragraph 5 of Plaintiff's Complaint.

6.      The allegations contained in Paragraph 6 of Plaintiff's Complaint are legal conclusions to which no response is required; however, to the extent an answer is required of D.R. Horton, D.R. Horton denies the same.

7.    D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 7 of Plaintiff's Complaint, and therefore denies the same.

8.    D.R. Horton denies the allegations contained in Paragraph 8 of Plaintiff's Complaint.

9.    D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 9 of Plaintiff's Complaint, and therefore denies the same.

10.    D.R. Horton denies the allegations contained in Paragraph 10 of Plaintiff's Complaint.

11.    D.R. Horton denies the allegations contained in Paragraph 11 of Plaintiff's Complaint.

12.    D.R. Horton denies the allegations contained in Paragraph 12 of Plaintiff's Complaint.

13.    D.R. Horton denies the allegations contained in Paragraph 13 of Plaintiff's Complaint.

14.    D.R. Horton denies the allegations contained in Paragraph 14 of Plaintiff's Complaint.

15.    D.R. Horton denies the allegations contained in Paragraph 15 of Plaintiff's Complaint.

16.    D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 16 of Plaintiff's Complaint, and therefore denies the same.

17.    D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 17 of Plaintiff's Complaint, and therefore denies the same.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

18.     D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 18 of Plaintiff's Complaint, and therefore denies the same.

19.     The allegations contained in Paragraph 19 of Plaintiff's Complaint are legal conclusions to which no response is required; however, to the extent an answer is required of D.R. Horton, D.R. Horton denies the same.

20.     The allegations contained in Paragraph 20 of Plaintiff's Complaint are legal conclusions to which no response is required; however, to the extent an answer is required of D.R. Horton, D.R. Horton denies the same.

21.     The allegations contained in Paragraph 21 of Plaintiff's Complaint are legal conclusions to which no response is required; however, to the extent an answer is required of D.R. Horton, D.R. Horton denies the same.

22.     D.R. Horton is without sufficient information to form a belief as to the allegations contained in Paragraph 22 of Plaintiff's Complaint, and therefore denies the same.

23.     The allegations contained in Paragraph 23 of Plaintiff's Complaint are legal conclusions to which no response is required; however, to the extent an answer is required of D.R. Horton, D.R. Horton denies the same.

24.     D.R. Horton denies the allegations contained in Paragraph 24 of Plaintiff's Complaint.

25.     Paragraph 25 of Plaintiff's Complaint can neither be admitted nor denied, and D.R. Horton herein reasserts and realleges its answers and defenses to the prior allegations of Plaintiff's Complaint as set forth above.

26.     The allegations contained in Paragraph 26 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required,

D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 26 of Plaintiff's Complaint and, therefore, denies the same.

27.      The allegations contained in Paragraph 27 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 27 of Plaintiff's Complaint and, therefore, denies the same.

28.      The allegations contained in Paragraph 28 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 28 of Plaintiff's Complaint and, therefore, denies the same.

29.      The allegations contained in Paragraph 29 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 29 of Plaintiff's Complaint and, therefore, denies the same.

30.      The allegations contained in Paragraph 30 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 30 of Plaintiff's Complaint and, therefore, denies the same.

31.      The allegations contained in Paragraph 31 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 31 of Plaintiff's Complaint and, therefore, denies the same.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

32.     The allegations contained in Paragraph 32 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 32 of Plaintiff's Complaint and, therefore, denies the same.

33.     The allegations contained in Paragraph 33 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 33 of Plaintiff's Complaint and, therefore, denies the same.

34.     The allegations contained in Paragraph 34 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 34 of Plaintiff's Complaint and, therefore, denies the same.

35.     The allegations contained in Paragraph 35 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 35 of Plaintiff's Complaint and, therefore, denies the same.

36.     The allegations contained in Paragraph 36 of Plaintiff's Complaint are not directed to D.R. Horton; therefore, a response is not required. However, to the extent a response is required, D.R. Horton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 36 of Plaintiff's Complaint and, therefore, denies the same.

37.     Paragraph 37 of Plaintiff's Complaint can neither be admitted nor denied, and D.R. Horton herein reasserts and realleges its answers and defenses to the prior allegations of Plaintiff's Complaint as set forth above.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

38. D.R. Horton denies the allegations contained in Paragraph 38 of Plaintiff's Complaint.

39. D.R. Horton denies the allegations contained in Paragraph 39 of Plaintiff's Complaint.

40. D.R. Horton denies the allegations contained in Paragraph 40 of Plaintiff's Complaint.

41. D.R. Horton denies the allegations contained in Paragraph 41 of Plaintiff's Complaint.

42. D.R. Horton denies the allegations contained in Paragraph 42 of Plaintiff's Complaint.

43. D.R. Horton denies the allegations contained in Paragraph 43 of Plaintiff's Complaint.

44. D.R. Horton denies the allegations contained in Paragraph 44 of Plaintiff's Complaint.

45. D.R. Horton denies the allegations contained in Paragraph 45 of Plaintiff's Complaint.

46. D.R. Horton denies the allegations contained in Paragraph 46 of Plaintiff's Complaint.

47. D.R. Horton denies the allegations contained in Paragraph 47 of Plaintiff's Complaint.

48. Paragraph 48 of Plaintiff's Complaint can neither be admitted nor denied, and D.R. Horton herein reasserts and realleges its answers and defenses to the prior allegations of Plaintiff's Complaint as set forth above.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

49.     D.R. Horton denies the allegations contained in Paragraph 49 of Plaintiff's Complaint.

50.     D.R. Horton denies the allegations contained in Paragraph 50 of Plaintiff's Complaint.

51.     D.R. Horton denies the allegations contained in Paragraph 51 of Plaintiff's Complaint.

52.     D.R. Horton denies the allegations contained in Paragraph 52 of Plaintiff's Complaint.

53.     D.R. Horton denies the allegations contained in Paragraph 53 of Plaintiff's Complaint.

54.     D.R. Horton denies the allegations contained in Paragraph 54 of Plaintiff's Complaint.

55.     Paragraph 55 of Plaintiff's Complaint can neither be admitted nor denied, and D.R. Horton herein reasserts and realleges its answers and defenses to the prior allegations of Plaintiff's Complaint as set forth above.

56.     D.R. Horton denies the allegations contained in Paragraph 56 of Plaintiff's Complaint.

57.     D.R. Horton denies the allegations contained in Paragraph 57 of Plaintiff's Complaint.

58.     D.R. Horton denies the allegations contained in Paragraph 58 of Plaintiff's Complaint.

59.     D.R. Horton denies the allegations contained in Paragraph 59 of Plaintiff's Complaint.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

60. Paragraph 60 of Plaintiff's Complaint can neither be admitted nor denied, and D.R. Horton herein reasserts and realleges its answers and defenses to the prior allegations of Plaintiff's Complaint as set forth above.

61. The allegations contained in Paragraph 61 of Plaintiff's Complaint are legal conclusions to which no response is required; however, to the extent an answer is required of D.R. Horton, D.R. Horton denies the same.

62. D.R. Horton denies the allegations contained in Paragraph 62 of Plaintiff's Complaint.

63. D.R. Horton denies the allegations contained in Paragraph 63 of Plaintiff's Complaint.

64. D.R. Horton denies the allegations contained in Paragraph 64 of Plaintiff's Complaint.

65. D.R. Horton denies the allegations contained in Paragraph 65 of Plaintiff's Complaint.

66. With respect to the WHEREFORE Paragraph of Plaintiff's Complaint, D.R. Horton denies that Plaintiff is entitled to any relief it seeks by and through the Complaint.

**FOR A SECOND DEFENSE**

67. D.R. Horton incorporates herein the allegations of their first defense not inconsistent herewith.

68. D.R. Horton alleges that insofar as Plaintiff's Complaint seeks punitive damages, such damages are violative of both the United States and South Carolina Constitutions. As such, Plaintiff's claim for punitive damages is barred.

**FOR A THIRD DEFENSE**
**(Superseding/Intervening Negligence)**

69.    D.R. Horton incorporates herein the allegations of their first defense not inconsistent herewith.

70.    That if D.R. Horton was negligent, which is expressly denied, the superseding and intervening acts of third parties broke the chain of causation and were the proximate cause of any injuries as alleged by Plaintiff and D.R. Horton pleads superseding, intervening negligence of third parties as a complete bar to this action.

**FOR A FOURTH DEFENSE**

71.    D.R. Horton incorporates herein the allegations of their first defense not inconsistent.

72.    Defendant reserves and does not waive any additional further defenses that may be revealed by additional information that may be acquired in discovery or otherwise.

**FURTHER ANSWERING PLAINTIFF'S COMPLAINT AND BY WAY OF THIRD-PARTY PLAINTIFF'S COMPLAINT AGAINST THIRD-PARTY DEFENDANT KENNETH SCOTT BUILDERS, LLC**

73.    D.R. Horton incorporates herein the allegations of their first defense not inconsistent herewith.

74.    D.R. Horton asserts claims against Third-Party Defendant, Kenneth Scott Builders, LLC, ("KSB").

79.    To the extent the allegations contained in the Plaintiff's Complaint are not subject to binding arbitration, the Circuit Court has jurisdiction over the claims asserted in the Third-Party Complaint because the claims asserted herein are so related to the claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

80.     Plaintiff, in the underlying litigation, has filed a Complaint against D.R. Horton seeking damages related to a collision on May River Road in Bluffton, Beaufort County, South Carolina ("Collision").

81.     D.R. Horton contracted with KSB such that KSB was obligated to supply certain labor, materials, and designs used or incorporated into the construction one or more of the Cypress Ridge development.

82.     KSB entered into an agreement (the "Agreement") with D.R. Horton regarding its work (attached as **Exhibit A**).

83.     The Agreement speaks for itself, and D.R. Horton craves reference to the terms of the agreements, the same being are incorporated herein.

84.     As provided in the Agreement, KSB was to supply certain labor, materials, and/or designs regarding one or more of the improvements, including but not limited to the Cypress Ridge development.

85.     KSB implicitly and expressly agreed to perform its work in a good and workmanlike manner.

86.     KSB was aware of the need and the importance of providing competent and licensed drivers and employees, vehicles, and safety measures, including but not limited to licensed, safe drivers with appropriately maintained and inspected vehicles and liability insurance.

87.     D.R. Horton contends that KSB failed to meet its requirements of the Agreement, including, but not limited to, providing competent and licensed drivers and employees, vehicles, and safety measures, including but not limited to licensed, safe drivers with appropriately maintained and inspected vehicles and liability insurance.

88.     As part of the Agreement, KSB agreed to indemnify and hold harmless D.R. Horton and provide liability insurance for D.R. Horton on behalf of itself and any subcontractors.

89.     D.R. Horton fully satisfied and performed all requirements associated with and with respect to the Agreement.

90.     D.R. Horton alleges KSB, and its subcontractor was negligent, improperly licensed, and operating a vehicle that was not road worthy, maintained, or inspected without insurance.

91.     Although D.R. Horton is without fault, by virtue of the alleged acts and omissions of KSB, D.R. Horton has been subjected to suit and to the costs, expenses, attorneys' fees, and other damages associated therewith.

### FOR A FIRST CAUSE OF ACTION
**(Contractual Indemnification as to Co-Defendant)**

92.     D.R. Horton re-alleges the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

93.     Plaintiff has sued D.R. Horton claiming damages related to the Collision.

94.     KSB contracted with D.R. Horton to perform certain construction services and/or furnish certain materials on the Property and within the Community.

95.     Plaintiff has alleged that damages were in incurred in the Collision by the acts of KSB and its subcontractor.

96.     D.R. Horton is informed and believes that if, in fact, Plaintiff is entitled to recover under the allegations of the Complaint, that the allegations are the result of the wrongful acts omissions, negligence, gross negligence, and/or representations of KSB, all of which are contrary to the agreements and common laws of the State of South Carolina.

97.     To the extent, if any, that D.R. Horton is held liable to Plaintiff in this action, such liability would be the direct and proximate result of the wrongful acts, errors, and/or omissions,

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

negligence and/or gross negligence of KSB, which have damaged D.R. Horton as it has been subjected to liability and has incurred consequential damages in incurring the attorneys' fees and costs necessary to defend this action.

98.    KSB is contractually obligated to indemnify and hold D.R. Horton harmless from damages arising out of KSB's respective work pursuant to the Agreement as well as provide liability insurance to D.R. Horton.

99.    The alleged acts or omissions of KSB are the independent, active, primary, superseding, and/or intervening cause of damages allegedly suffered by Plaintiff, if any, and any wrongful acts or omissions by D.R. Horton, which are expressly denied, were passive and secondary only.

100.    D.R. Horton is entitled to a judgment for full contractual indemnification from any liability D.R. Horton is found to have to Plaintiff for the allegations and relief sought in the Complaint, and D.R. Horton would be entitled to damages for the acts, errors, and/or omissions, negligence and/or gross negligence of KSB that D.R. Horton, as described hereinabove, entitling D.R. Horton to recover from KSB, the attorneys' fees, costs, and any and all other expenses incurred by D.R. Horton associated with defending this action as well as any sums for which it may be held liable to Plaintiff, whether by judgment, compromise, settlement, or otherwise.

**FOR A SECOND CAUSE OF ACTION**
**(Equitable Indemnification as to Co-Defendant)**

101.    D.R. Horton re-alleges the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

102.    Plaintiff has sued D.R. Horton seeking damages related to a collision on May River Road in Bluffton, Beaufort County, South Carolina.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

103.    D.R. Horton has denied all substantive allegations against it that were made by Plaintiff.

104.    A sufficient special relationship exists between D.R. Horton and KSB.

105.    D.R. Horton is informed and believes that if, in fact, Plaintiff if entitled to recover under its allegations, that the allegations are the result of the wrongful acts, omissions, negligence, gross negligence, and/or representations of KSB, all of which are contrary to the statutory and common laws of the State of South Carolina.

106.    To the extent, if any, that D.R. Horton is held liable to Plaintiff in this action, such liability would be the direct and proximate result of the alleged wrongful acts, errors, and/or omissions, negligence and/or gross negligence of KSB, which has damaged D.R. Horton as it has been subjected to liability and has incurred consequential damages in incurring the attorneys' fees and costs necessary to defend this action.

107.    To the extent, if any, D.R. Horton is held liable to Plaintiff in this action, the alleged acts or omissions of KSB is the independent, active, primary, superseding, and/or intervening cause of damages allegedly suffered by Plaintiff, and any wrongful acts or omissions by D.R. Horton, which are expressly denied, were passive and secondary only.

108.    D.R. Horton is entitled to a judgment for full common law or equitable indemnification from KSB for any liability D.R. Horton is found to have to Plaintiff for the allegations and relief sought in the Complaint, and D.R. Horton would be entitled to damages for the acts, errors, and/or omissions, negligence and/or gross negligence of KSB as afore described, entitling D.R. Horton to recover from KSB its attorneys' fees, costs, and any and all other expenses associated with defending this action as well as any sums for which D.R. Horton may be held liable to Plaintiff, whether by judgment, compromise, settlement, or otherwise.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

### FOR A THIRD CAUSE OF ACTION
**(Breach of Contract as to Co-Defendant)**

109.    D.R. Horton re-alleges the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

110.    KSB was contractually responsible for performing the requirements in the Agreement correctly.

111.    To the extent that Plaintiff proves that KSB was responsible for the damages incurred in the Collision, KSB materially breached the Agreement as set forth above.

112.    D.R. Horton is entitled to judgment against KSB for breach of contract plus costs, expenses, attorneys' fees, and other damages associated therewith.

### FOR A FOURTH CAUSE OF ACTION
**(Negligence/Gross Negligence/Recklessness as to Co-Defendant)**

113.    D.R. Horton re-alleges the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

114.    Upon information and belief, KSB owed a duty to use due care in ensuring that proper subcontractors and vehicles were used in its work.

115.    If due care was not used in ensuring safety was achieved, then KSB breached its duty of care owed pursuant to the requirements under the Agreement and under the laws of South Carolina.

116.    D.R. Horton has been damaged as a direct and foreseeable and proximate result of KSB negligence/gross negligence/recklessness, and D.R. Horton is entitled to judgment against KSB for its damages, including costs, expense, attorneys' fees, and other damages associated therewith.

WHEREFORE, having fully answered Plaintiff's Complaint, Defendant, D.R. Horton, Inc. prays for:

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

(a) Dismissal of the Complaint and all causes of action contained therein, with prejudice, and an award to D.R. Horton for the attorney fees, costs, and other expenses incurred by D.R. Horton in defending this action;

(b) On D.R. Horton's First and Second Causes of Action, judgment in favor of D.R. Horton and against KSB in the amount of any liability D.R. Horton is found to have to the Plaintiff and requiring Co-Defendant to defend and indemnify D.R. Horton against any liability which D.R. Horton may be liable with regard to safety or insurance for which KSB was responsible;

(c) On D.R. Horton's Third Cause of Action, judgment in favor of D.R. Horton and against KSB for any costs, losses, or damages D.R. Horton may incur as it relates to KSB's breach of contract, including, attorneys' fees, costs, and any and all other expenses incurred in defending the Plaintiff's Complaint;

(d) On D.R. Horton's Fourth Cause of Action, judgment in favor of D.R. Horton and against KSB awarding actual, special, consequential and punitive damages in an amount to be determined at trial;

(e) Attorneys' fees;

(f) Costs of this action; and

(g) Such other and further relief that this Court deems just and proper.

Respectfully submitted,

**KENISON, DUDLEY & CRAWFORD, LLC**

*s/ Jason M. Imhoff*
Jason M. Imhoff (SC Bar # 69355)
704 East McBee Avenue
Greenville, South Carolina 29601
Telephone: (864) 242-4899
Facsimile: (864) 242-4844
imhoff@conlaw.com
*Counsel for Defendant D.R. Horton, Inc.*

October 26, 2022
Greenville, South Carolina

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479



**SOUTH CAROLINA INDEPENDENT CONTRACTOR AGREEMENT**

NAME OF CONTRACTOR Kenneth Tosly DBA Kenneth Scott Builders ("Contractor")

____ Sole Proprietorship ____ Partnership ✓ Corporation ____ L.L.C ____ Other (ATTACH W-9)

Social Security No. or Tax ID No.: 27-0393282

Name of Owner(s)/Officer(s): Kenneth S. Tosley

Division Name: COASTAL CAROLINA  Area Name: HILTUIHEAD/SAVANNAH  Assigned Vendor No.: 201618 1

Address for All Notices: PO Box 1590

City: Bluffton                                        State: SC  Zip Code: 29910

Telephone: 843-247-1025 Fax: (843-813-3491 E-Mail Address: Ken@Kenneth Sott Builders.com

Insurance Carriers: ATTACH INSURANCE CERTIFICATES, OR THERE WILL AUTOMATICALLY BE WITHHOLDING AND DEDUCTIONS.

This agreement (the "Agreement") is entered into on this ___17 day of February 2016 between DR Horton, INC _____ ("Owner") and Contractor.

**1. SCOPE OF WORK.** This Agreement is entered on a blanket basis. The terms of this Agreement shall govern all current and future work of Contractor for Owner. The work to be performed under this Agreement shall include all work performed and materials supplied by Contractor, directly or indirectly, to Owner, including but not limited to the labor, services and/or materials, equipment, transportation, or facilities used or required to complete the construction-related activities of Owner authorized by written purchase order, or similar document by Owner's authorized field personnel (the "Work"). The applicable quantities and pricing for the Work shall be reflected in the price sheet, proposal, bid, or purchase order issued by Owner, or in other documentation most recently accepted and approved in writing by Owner (the "Pricing Schedule"). The Pricing Schedule or any other writing shall not modify any of the terms of this Agreement unless executed in the form of an amendment to this Agreement. Owner is not obligated to award any work on specific property to Contractor regardless of the Pricing Schedule, does not guarantee any quantity of work to Contractor, and may at its sole option retain others to perform the Work or similar work at any job location in addition to, or in place of, Contractor.

**2. INDEPENDENT CONTRACTOR STATUS.** Contractor, in performing the Work, shall do so as an independent contractor and shall have the sole right and obligation to control the manner, means, method and performance of the Work. Contractor shall ensure that the results achieved satisfy the requirements of this Agreement. Contractor shall be responsible, and liable, for all acts and omissions of its employees, agents, subcontractors and other persons performing any portion of the Work, and shall ensure that all personnel performing the Work are qualified and competent to perform their assigned tasks and have all necessary licenses. Contractor further shall provide written notification to all of its present and future employees of Contractor's provision for Workers Compensation Insurance. Any provisions in this Agreement which may appear to give Owner the right to direct Contractor as to the details of doing the Work or to exercise a measure of control over the Work shall be deemed to mean that Contractor shall follow the desires of Owner in the results of the Work only.

**3. CONTRACT PRICE.**

**3.1 Pricing Schedule.** The Pricing Schedule shall be applicable to all Work performed under this Agreement. The Pricing Schedule shall reflect the maximum total payment due to Contractor.

**3.2 Taxes.** Contractor shall be solely responsible for and will pay all withholding, Social Security, state unemployment and all other similar taxes for Contractor's employees, agents or subcontractors. In addition, Contractor shall pay all applicable sales or use taxes on labor provided and materials furnished or otherwise required by law in connection with the Work, unless Owner furnishes Contractor with a Resale Certificate or Exemption Certificate. If Contractor performs under a fixed-price contract (one price for materials and incorporated skill and labor), the contract price includes all sales and use taxes.

**3.3 Price Increases.** NO PRICE INCREASE SHALL BE BINDING UPON OWNER UNTIL CONTRACTOR GIVES OWNER ONE HUNDRED TWENTY (120) DAYS WRITTEN NOTICE BEFORE ANY PRICE INCREASE IS IMPLEMENTED. Notwithstanding anything contained on any new Pricing Schedule implementing a price increase, the superseded Pricing Schedule shall remain in effect for Purchase Orders, as defined herein, issued after the date of any new Pricing Schedule until the expiration of the notice period.

**4. PAYMENT.**

**4.1 Invoices.** Contractor shall invoice Owner no later than the earlier of (i) ninety (90) days after completion of the Work or (ii) thirty (30) days from the date of closing from Owner to a purchaser of the house incorporating the Work. To the extent permitted by law, Contractor waives its right to payment for any Work not invoiced in a timely manner. Owner shall timely pay Contractor for completed Work, provided that Contractor has performed in accordance with and has fully complied with all terms and conditions of this Agreement. If the Work is to be performed in stages, payments may be made for each stage at Owner's option. All Work described on a Purchase Order shall be considered separate and distinct from Work described on any other Purchase Order, as defined herein.

CONTRACTOR SPECIFICALLY WAIVES THE RIGHTS AND REMEDIES SET FORTH AT S.C. CODE ANN. §§ 29-6-30 AND 29-6-50 CONCERNING THE TIMING OF PAYMENTS AND INTEREST ON DELAYED PAYMENTS. CONTRACTOR ACKNOWLEDGES THAT THE TERMS OF THIS AGREEMENT CONTROL AS TO THE TIMING OF PAYMENTS AND THAT NO PROVISION FOR INTEREST DUE TO CONTRACTOR IN THE CASE OF DELAYED PAYMENTS IS MADE HEREIN. CONTRACTOR

THIS AGREEMENT CONSISTS OF SEVEN (7) PAGES AND ADDENDA, IF ANY.

Executed this 17 day of February 2016.

Owner:
By:
Name: DON BUTNER
Title: Division President
ASSISTANT VICE-PRESIDENT

Contractor:
By:
Name: Ken J Tosly
Title: Owner

INITIALS: OWNER ___, CONTRACTOR ___

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**AGREES THAT OWNER DOES, AND WILL, NOT OWE INTEREST ON ANY TERMS WHATSOEVER IN THE CASE OF ANY DELAYED PAYMENT.**

**4.2 Contractor Payments.** No payments shall be due under this Agreement until Contractor's invoice (or Purchase Orders, as defined herein, if applicable) for the Work has been submitted to Owner for payment. This action shall constitute a representation and confirmation by Contractor that all Work (or a specified portion of the Work) to be performed on a specific job location has been completed satisfactorily and that all material suppliers, laborers and subcontractors have been paid in full. In exchange for progress payments, Owner may require a partial release (to the extent of all payments made) of all liens for materials furnished and labor performed by Contractor, its employees and agents and all third parties furnishing labor or materials in connection with the Work so performed, and an affidavit that no person has a right to any lien for materials or labor. Unless otherwise agreed by Owner and Contractor, payment to Contractor shall be made by check. Owner may, at any time, in its discretion, make checks payable jointly to Contractor and one or more third parties; and those joint payments shall satisfy amounts owed by Owner to Contractor, whether or not all parties endorse the checks.

**4.3 Acceptance of Work.** Acceptance by Contractor of the final payment of the contract price shall waive and release all claims against Owner under this Agreement, but shall not waive any claims of Owner arising out of or resulting from the Work and shall not release Contractor from any obligations under this Agreement, including but not limited to liability for warranties, warranty service, or any other liability for alleged defects in the Work. No certificate issued, nor payment made to Contractor, nor partial or entire use or occupancy of the Work by Owner or its agents or customers or assigns shall constitute an acceptance of the Work or materials not in compliance with this Agreement, or be used in any way as evidence of acceptance by Owner.

## 5. SCHEDULE OF WORK.

**5.1 Construction Schedule.** Contractor acknowledges that **TIME IS OF THE ESSENCE** in the performance of all Work and obligations under this Agreement. Owner may alter the time, order and priority for performance of all components of the Work and all matters relative to the timely and orderly conduct of the Work without increase in price or liability of any kind to Contractor or others. Contractor shall coordinate with Owner all Work scheduled and cooperate with other contractors.

**5.2 Authorization and Commencement of the Work.** Authorization for any Work shall be in writing, either pursuant to a written purchase order, work invoice, or similar document ("Purchase Order"). Contractor shall have no authority to commence the Work at any specific job location until Owner has issued instructions to proceed. Contractor shall commence the Work no later than three (3) days after notice to proceed from Owner, and if such Work is interrupted at the direction of Owner, Contractor shall resume such Work within two (2) working days of Owner's direction to resume.

**5.3 Changes in Construction Schedule.** Owner shall have the right to make changes to the schedule of Work at Owner's sole discretion, and Contractor shall comply with such changes. Contractor shall not be entitled to any additional compensation for such schedule changes.

## 6. PERFORMANCE OF THE WORK.

**6.1 Applicable Standards.** Contractor shall perform all Work in accordance with any plans or specifications of Owner, in a good and workmanlike manner, and in accordance with all industry standards and practices. The Work shall meet or exceed FHA minimum property standards, VA requirements, all manufacturers' or suppliers' standards or specifications for use and installation, and all laws (statutory and common law), ordinances, rules (governmental and private agency), and regulations (including but not limited to any applicable building code requirements). In the event of conflicting provisions, specifications will take precedence over the drawings; the more specific provision will take precedence over the less specific; the more stringent will take precedence over the less stringent; the more expensive item will take precedence over the less expensive; later modifications or changes will supersede or take precedence over earlier provisions. Contractor shall immediately notify Owner in writing of any allegedly conflicting provisions.

**6.2 Representative(s).** Contractor shall have a competent representative at the job site at all times during performance of the Work who shall have absolute authority to act, in all respects, on behalf of and for Contractor.

**6.3 Contractor's Acknowledgements Regarding Work.** Contractor's commencement of the Work shall be deemed as Contractor's agreement to complete the Work by the completion date specified by an authorized employee of Owner and shall be deemed as Contractor's acknowledgment that Contractor has inspected the job location, is thoroughly familiar with the plans and specifications, and that the plans and specifications are clear and unambiguous, and that Contractor has accepted and agreed to be bound by all such requirements.

**6.4 Government Requirements.** Contractor shall comply with all applicable federal, state, and local laws and statutes, ordinances, rules, regulations, orders, codes, licensing requirements and standards relating in any way to the performance of the Work, including but not limited to the requirements of the Occupational Safety and Health Act of 1970 as amended, the training and record-keeping requirements of the Hazard Communication Standard, 29 C.F.R. §1926.59 et seq., and the procurement and posting of all required permits and notices (the "Requirements"). In addition to its obligations under Section 10 of this Agreement, Contractor shall immediately pay all fines or penalties assessed upon Contractor or Owner relating to the Work for any violation of or noncompliance with the Requirements, and shall, to the fullest extent permitted by law, **INDEMNIFY, DEFEND, and HOLD OWNER HARMLESS** from and against any and all claims, demands, liability, losses, costs, damages or expenses including attorneys' fees and costs incurred, lawsuits, actions, causes of action, citations or work stoppages, or other litigation of every kind and character in any way incident to, in connection with, or arising out of any alleged violation of or noncompliance with the Requirements by Contractor, or any individual or entity acting on behalf of or at the direction of Contractor, regardless of any alleged fault of Owner. In addition, Contractor shall not discriminate illegally in its hiring or employment and shall comply with all state and federal employment laws or regulations. Contractor shall perform background checks and ensure only suitable persons perform warranty or repair work after a house is occupied.

**6.5 Observation, Inspection and Testing.** Owner and any government agency inspector ("Inspector") shall have the right, but not the obligation, to observe, inspect or test the Work at any time during or after construction, but that observation, inspection or testing is solely for the benefit of Owner and is not for Contractor's benefit. Contractor shall cooperate with Owner and Inspector during any such inspection. The failure by Owner or Inspector to note defects in the Work during an inspection shall not waive or vary any of Contractor's obligations, representations or warranties related to the Work.

**6.6 Work of Others.** Contractor shall be responsible for inspecting any work of another contractor that may affect Contractor's own Work in any way, and shall report in writing to Owner any defects in the work of any other contractor prior to commencement of any Work, or Contractor shall be deemed to have accepted all other contractors' work for inclusion into Contractor's Work.

**6.7 Licenses, Permits, and Approvals.** Contractor shall secure and maintain all permits, licenses, approvals, and as-built drawings necessary for, or applicable to, the performance of the Work. Contractor shall provide copies to Owner immediately upon request.

**6.8 Change Orders.** Owner and Contractor agree that no additional charge or increased price shall be charged by Contractor for any change or alteration unless set forth in a written variance agreement or change order ("Change Order") or Purchase Order signed by Owner and Contractor before the commencement of such changes. Contractor shall comply with any Change Order requested by Owner, without nullifying this Agreement, at a reasonable addition to, or reduction from, the Pricing Schedule.

**6.9 Subdivision Rules.** Contractor shall comply fully with all rules, regulations, and restrictive covenants governing the subdivision in which

INITIALS: OWNER  CONTRACTOR

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

the Work is performed, including without limitation, rules, regulations and restrictions (i) establishing hours and/or days that Work may be performed; (ii) governing storage of materials on the job location; (iii) regulating trash pick-up and waste collection at the job location; and (iv) Work Site safety requirements. Contractor shall be subject to subdivision rules which provide for fines payable to Owner by Contractor for failure to comply with such rules, which may be deducted by Owner from any sums owed by Owner to Contractor.

**6.10 Clean-up.** Contractor shall at all times keep the job site free from accumulation of waste or other discarded materials, including but not limited to trash, unused building materials, garbage, refuse or rubbish ("Waste"), caused by its operations and shall remove all of Contractor's materials at the conclusion of the Work. If materials are furnished by Owner, Contractor shall move all usable materials at the conclusion of the Work to a location designated by Owner. In addition to removal of all Waste upon the conclusion of the Work, Contractor shall leave the inside of any home under construction in "broom clean" condition. Contractor shall dispose of all Waste properly, and may place it in any receptacles intended for that purpose or at other locations designated by Owner. Contractor's failure to comply with this provision shall authorize Owner to undertake any necessary clean-up. The cost of any such clean-up shall be payable by Contractor immediately upon demand by Owner and may be deducted by Owner from any sums owed to Contractor.

## 7. SAFETY.

**7.1 Contractor Responsibility for Safety.** Contractor shall, at its own expense, be solely responsible for protecting its employees, subcontractors, material suppliers and all other persons from risk of death, injury or bodily harm arising from, or in any way related to, the Work or the construction site on which the Work is being performed (the "Work Site"), and ensuring full compliance with all government safety and OSHA rules and regulations. Contractor shall have an ongoing safety program and conduct inspections to ensure that safe working conditions and equipment exist and safe practices are observed. Contractor shall have a competent person on the Work Site at all times in charge of Contractor's safety program. UNDER NO CIRCUMSTANCES SHALL THE ACTIONS OF OWNER IN REQUIRING IMPLEMENTATION OF A SAFETY PROGRAM BE CONSTRUED AS OWNER HAVING CONTROL OVER CONTRACTOR'S SAFETY PROGRAM. CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR THE CONTENT AND IMPLEMENTATION OF ITS SAFETY PROGRAM WHICH SHALL MEET OR EXCEED APPLICABLE LEGAL STANDARDS. CONTRACTOR AGREES THAT OWNER HAS NO RESPONSIBILITY OR LIABILITY FOR THE PHYSICAL CONDITION OR SAFETY OF THE WORK SITE. Contractor shall immediately notify Owner's construction supervisors of any unsafe conditions or practices observed on the Work Site and promptly send Owner a written notice if the condition or practice is not immediately remedied. Further, Contractor shall immediately notify in writing Owner and Contractor's insurer of any accidents or injuries on the Work Site. Contractor shall prohibit and prevent the presence on the Work Site of persons under age eighteen (18) and all persons not involved in the Work.

**7.2 Safety Laws.** Contractor shall fully comply with all laws, orders, citations, rules, regulations, standards and statutes concerning occupational health and safety, accident prevention, safety equipment and practices, including but not limited to federal and state OSHA regulations ("Safety Law"). In addition to its obligations under Section 10 of this Agreement, Contractor shall immediately pay all fines or penalties assessed upon Contractor or Owner relating to the Work for any violation of, or noncompliance with, the Safety Law, and shall, to the fullest extent permitted by law, INDEMNIFY, DEFEND, and HOLD OWNER HARMLESS from and against any and all claims, demands, liability, losses, costs, damages or expenses including attorneys' fees and costs incurred, lawsuits, actions, causes of action, citations or work stoppages, or other litigation of every kind and character in any way incident to, in connection with, or arising out of any alleged violation or noncompliance by Contractor, or any individual or entity acting on behalf of or at the direction of Contractor, of the Safety Law, or safety citation, regardless of any alleged fault of Owner. Contractor shall provide Owner with written verification of compliance with Hazard Communication Standard, 29 C.F.R. §1926.59 et seq., and, if required by law, provide written notice to Owner of the contact person responsible for Contractor's safety compliance.

**7.3 Hazardous Materials.** Contractor shall not permit any Hazardous Substances, defined below, to be brought onto or stored at any job site or used in the construction of the Work, except for commonly used construction materials, provided however, that all such material shall be handled in full compliance with all laws, ordinances and regulations. All notices required to be given with respect to such products shall be given by Contractor. Contractor shall not release or dispose, nor allow any other person to release or dispose, of Hazardous Substances or waste at any job site or into the soil, drains, surface or ground water, or air. "Hazardous Substance" means any substance or material which any state, federal or local governmental authority determines or designates as capable of posing a risk of injury to health, safety, property or the environment.

**7.4 No Alcohol or Drugs.** Contractor shall prohibit and prevent the presence or use of alcohol or drugs by its employees, agents, subcontractors or suppliers at a job location, or performance of the Work by any person under the influence of alcohol or drugs. "Drugs" shall include any substance, whether or not illegal, which upon exposure, ingestion, inhalation, injection or by any other introduction, may impair one's ability to safely perform the Work.

## 8. CONTRACTOR'S WARRANTIES.

**8.1 Against Defective Work.** For the longer of ten years or the period of any applicable statute of limitation or repose, Contractor unconditionally warrants to Owner, its parent, subsidiary or affiliate entities, or successors and assigns, that all Work shall conform to the specifications of this Agreement (including but not limited to the standards referenced in Subsection 6.1), shall be free from any defects or deficiencies in workmanship or materials, shall comply with the requirements of all applicable governing authorities, laws, regulations and ordinances, shall meet or exceed the FHA/VA minimum property standards, and shall comply with the Home Owners' Warranty, defined below and its applicable warranty standards (which Contractor has read and understands). All Work not conforming to these requirements shall be considered to be defective. All material shall be new and of best quality within the scope of the Pricing Schedule and free from defects. Contractor shall be liable to make good or promptly repair all Work not complying with the standards set forth in this Section at its own expense.

**8.2 Home Owners Warranty.** In addition to the warranty in Subsection 8.1, Contractor warrants that the Work shall remain free of defects for the following warranty periods beginning on the earlier of the date of occupancy by, or transfer of title from Owner to, any initial home purchaser of property subject to the Work: (i) for a period of ten (10) years all structural elements, including but not limited to roof framing members (rafters and trusses), floor framing members (joists and trusses), bearing walls, columns, lintels (other than lintels supporting veneers), girders, load-bearing beams, and foundation and footing systems; (ii) for a period of two (2) years all: (a) heating/ventilating/air conditioning duct work, refrigerant lines, steam and water pipes, registers, convectors and dampers, (b) plumbing pipes (supply and waste) and their fittings, as well as gas supply lines and vent pipes located within the home, and (c) electrical wiring, electrical boxes and connections up to the public utility connections, installed by Contractor; and (iii) all other elements for a period of one (1) year but in no event shall a warranty period or coverage for the system, element or other portion of the Work be less than the applicable warranty period or coverage for such system, element, or other portion of the Work under (a) any statutory warranty or (b) residential warranty program from any residential warranty company for the residential warranty policy to be provided by Owner to any Homeowner, including but not limited to the Residential Warranty Corporation Program (a "Home Owners' Warranty"). Owner shall use its best efforts to provide Contractor with notice of any warranty period under any Home Owners Warranty that is longer than the warranty periods stated above; provided, however, failure to give that notice will not affect the extension of the warranty period to the applicable warranty period under the Home Owners Warranty.

**8.3 Repair by Owner Does Not Waive Warranty.** The performance/fulfillment of any warranty repair responsibilities by Owner or any other third party will not affect, minimize, or in any way obviate Contractor's warranty or indemnity obligations hereunder, nor shall it affect Owner's right to require Contractor to perform warranty services thereafter.

**8.4 Transfer of Manufacturers Warranties.** Contractor shall furnish, transfer and assign all warranties, relevant product information, and guarantees by manufacturers on components of the Work, including any appliances or equipment, and shall furnish all certificates required by any third parties such as any municipality, the VA, or the FHA. These warranties, guarantees, and certificates are in addition to all other warranties or obligations of Contractor provided by law or otherwise and shall not limit or reduce any applicable statutes of limitation.



INITIALS: OWNER _____, CONTRACTOR _____

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**8.5 Transfer of Title and Ownership to Work and Other Documents.** Contractor warrants and hereby transfers title to all Work, including, but not limited to all materials, products, samples, as-built drawings and shop drawings, to Owner, either upon incorporation in the construction or upon receipt of payment by Contractor, whichever occurs first, free and clear of all liens, claims, security interests or encumbrances. To the extent subject to copyright law, all Work shall be considered a "work made for hire." Upon request of Owner, Contractor shall also provide any other documents necessary to transfer any and all ownership rights to the Work, including, but not limited to any copyright rights, to Owner.

## 9. LIENS AND RETAINAGE.

**9.1 Contractor's Lien Waiver.** TO THE EXTENT PERMITTED BY LAW, CONTRACTOR, FOR ITSELF, ITS EMPLOYEES, SUBCONTRACTORS AND SUPPLIERS, HEREBY WAIVES ITS STATUTORY, CONSTITUTIONAL AND COMMON LAW RIGHTS TO ASSERT LIENS OR SIMILAR CLAIMS AGAINST OWNER OR ITS PROPERTY.

**9.2 Retainage.** At all times during the performance of this Agreement and for thirty (30) days afterwards, Owner shall be entitled to hold, for all Work in progress, the greater of ten percent (10%) or any allowable retainage and any statutory sums in accordance with the laws of the state in which the Work is located.

**9.3 Lien Claim Indemnity.** If any liens, affidavits of claim, stop payment notices, or lis pendens arising out of the Work are filed or provided to Owner, Contractor agrees that Owner shall be entitled to withhold all further payments to Contractor until Contractor causes such liens, affidavits of claim, stop payment notices, or lis pendens to be removed and released of record. In addition to its obligations under Section 10 of this Agreement, Contractor shall, to the fullest extent permitted by law, INDEMNIFY, DEFEND, and HOLD OWNER HARMLESS from any loss, expense, including legal fees and disbursements, damage or injury caused or occasioned, directly or indirectly, by any such liens, affidavits of claim, stop payment notices, or lis pendens, and further agrees immediately upon Owners' request to: (i) procure a bond to indemnify Owner and any purchaser of property including the Work, in an amount sufficient to discharge any and all liens, affidavits of claim, stop payment notices, or lis pendens, or (ii) pay to Owner all monies, including any additional amount necessary to cover all attorneys' fees, expenses and court costs paid by Owner or any home purchaser in discharging the liens, affidavits of claim, stop payment notices, or lis pendens whichever remedy Owner elects in its sole and absolute discretion. The provisions of this paragraph shall be in addition to any rights Owner may have under applicable law with respect to such liens, affidavits of claim, stop payment notices, or lis pendens.

## 10. CONTRACTOR'S INDEMNITY.

**10.1 GENERALLY.** TO THE FULLEST EXTENT PERMITTED BY LAW, CONTRACTOR SHALL PROTECT, DEFEND, INDEMNIFY, AND HOLD OWNER AND OWNER'S PARENT CORPORATION, SUBSIDIARIES, AFFILIATES, SUCCESSORS AND ASSIGNS, AND EACH OF THESE ENTITIES' RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, AGENTS AND INSURERS (INDIVIDUALLY OR COLLECTIVELY "INDEMNITEE") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LAWSUITS OR OTHER LITIGATION, ACTIONS, CAUSES OF ACTION, OR OTHER LIABILITIES, OF EVERY KIND AND CHARACTER (INCLUDING ALL COSTS THEREOF, ATTORNEYS' FEES AND INTEREST), WHETHER ASSERTED BY A PURCHASER OR OWNER, CONTRACTOR, OR ANY THIRD PARTY (INCLUDING BUT NOT LIMITED TO PERSONNEL FURNISHED BY CONTRACTOR, ITS SUPPLIERS AND SUBCONTRACTORS OF ANY TIER), ON ACCOUNT OF BODILY OR PERSONAL INJURY, DEATH, OR DAMAGE TO OR LOSS OF TANGIBLE OR INTANGIBLE PROPERTY INCLUDING THE LOSS OF USE THEREOF IN ANY WAY OCCURRING, INCIDENT TO, ARISING OUT OF, OR IN CONNECTION WITH: (1) A BREACH OF ANY WARRANTIES, REPRESENTATIONS, COVENANTS, OR OTHER OBLIGATIONS OF CONTRACTOR SET FORTH IN THIS AGREEMENT; (2) THE WORK, AS DEFINED IN SECTION 1, INCLUDING BUT NOT LIMITED TO WORK PERFORMED OR TO BE PERFORMED OR MATERIAL SUPPLIED BY CONTRACTOR OR BY CONTRACTOR'S AGENTS OR EMPLOYEES, OR BY ITS SUPPLIERS OR SUBCONTRACTORS OF ANY TIER, OR THEIR RESPECTIVE AGENTS OR EMPLOYEES; (3) ANY NEGLIGENT OR INTENTIONAL ACT OR OMISSION OF CONTRACTOR OR ANY OF CONTRACTOR'S EMPLOYEES, PERSONNEL, AGENTS, SUPPLIERS OR SUBCONTRACTORS, REGARDLESS OF WHETHER CAUSED IN PART BY INDEMNITEE; OR (4) ANY NEGLIGENT OR INTENTIONAL ACT OR OMISSION OF INDEMNITEE RELATED IN ANY WAY TO THE WORK. CONTRACTOR'S DUTY TO DEFEND IS A SEPARATE, DISTINCT, AND INDEPENDENT OBLIGATION FROM ITS DUTY TO INDEMNIFY AND IS TRIGGERED IMMEDIATELY WHEN ANY CLAIM, DEMAND, OR OTHER ASSERTION OF LIABILITY IS MADE AGAINST INDEMNITEE WHICH POTENTIALLY OR ARGUABLY IS SUBJECT TO CONTRACTOR'S DUTY TO INDEMNIFY, REGARDLESS OF CONTRACTOR'S ULTIMATE LIABILITY FOR INDEMNITY. CONTRACTOR MUST DEFEND INDEMNITEE EVEN WHERE THE ALLEGATIONS AGAINST INDEMNITEE ARE AMBIGUOUS OR INCOMPLETE WITH RESPECT TO THE ISSUE OF CONTRACTOR'S DUTY TO INDEMNIFY. ONCE THE DUTY TO DEFEND IS TRIGGERED, CONTRACTOR IS OBLIGATED TO DEFEND THE ENTIRE ACTION, LAWSUIT, ARBITRATION, OR OTHER LITIGATION, INCLUDING ANY CLAIMS THEREIN NOT SUBJECT TO INDEMNITY BY CONTRACTOR. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL REQUIRE CONTRACTOR TO INDEMNIFY INDEMNITEE AGAINST LIABILITY FOR DAMAGES ARISING OUT OF BODILY INJURY OR PROPERTY DAMAGE PROXIMATELY CAUSED BY OR RESULTING FROM THE SOLE NEGLIGENCE OR SOLE INTENTIONAL ACT OR OMISSION OF INDEMNITEE. CONTRACTOR AGREES THAT ITS OBLIGATIONS SHALL NOT BE LIMITED BY ANY LIMITATION ON THE AMOUNT OF DAMAGES, COMPENSATION OR BENEFITS PAYABLE BY OR FOR CONTRACTOR UNDER WORKERS COMPENSATION ACTS, DISABILITY BENEFIT ACTS OR OTHER EMPLOYEE BENEFIT ACTS. PAYMENT FOR THE WORK IS NOT A CONDITION PRECEDENT TO CONTRACTOR'S OBLIGATIONS UNDER THIS SECTION.

**10.2 INDEMNITY NOT EXCLUSIVE REMEDY.** ANY PAYMENTS BY CONTRACTOR UNDER SECTION 10 TO OR ON BEHALF OF THE INDEMNITEE SHALL BE IN ADDITION TO ALL OTHER LEGAL REMEDIES AVAILABLE TO THE INDEMNITEE AND SHALL NOT BE CONSIDERED THE INDEMNITEE'S EXCLUSIVE REMEDY. INDEMNITEE SHALL HAVE THE RIGHT, IF IT SO CHOOSES IN ITS ABSOLUTE DISCRETION, TO DEFEND ALL CLAIMS WHICH MAY BE ASSERTED, AND CONTRACTOR WILL REIMBURSE INDEMNITEE FOR ALL EXPENDITURES THAT OWNER MAY INCUR ON ACCOUNT OF THE CLAIM.

**10.3 NO BAILMENT.** CONTRACTOR AND CONTRACTOR'S EMPLOYEES, PERSONNEL, AGENTS, ALL SUBCONTRACTORS, AND SUPPLIERS SHALL BE SOLELY RESPONSIBLE FOR THEIR RESPECTIVE TOOLS, MATERIALS, AND EQUIPMENT, AND HEREBY WAIVE ANY RIGHT OF RECOVERY AGAINST THE INDEMNITEE WITH RESPECT TO: (1) ANY LOSS OF SUCH TOOLS, MATERIALS, OR EQUIPMENT, OR (2) ANY DAMAGE TO SUCH TOOLS, MATERIALS OR EQUIPMENT.

**10.4 Subcontractors and Suppliers Indemnity Obligations.** Contractor shall require each of its subcontractors to agree to indemnify Indemnitee to the same extent that Contractor is required to indemnify Indemnitee in this Agreement. Before a subcontractor begins its Work, Contractor shall obtain a signed agreement from that subcontractor indemnifying Indemnitee to the extent required and provide that agreement and evidence of satisfactory insurance to Owner. In addition, to the extent permitted by law, Contractor shall require that each supplier or subcontractor indemnify Indemnitee from all losses arising from any materials or labor incorporated into the Work. Contractor shall require subcontractors and material suppliers to agree to submit to binding arbitration on the terms set forth in Section 13 of this Agreement. For all purposes, including the purposes of this Agreement, Contractor shall be fully responsible for all of the acts and omissions of any subcontractor or supplier who performs any part of the Work, and all obligations of Contractor under this Agreement shall be deemed also to be the obligation of the subcontractors or suppliers to Owner, for which Contractor shall be fully responsible to Owner.

INITIALS: OWNER _____, CONTRACTOR _____

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

## 11. INSURANCE.

**11.1 General Liability.** Contractor agrees to carry a Broad Form Commercial General Liability Insurance on an Occurrence Form (the "CGL Policy"), with products-completed operations coverage, which contains a per occurrence limit of no less than One Million Dollars ($1,000,000.00), and an aggregate limit of no less than Two Million Dollars ($2,000,000.00) protecting against bodily injury, broad form property damage, and personal injury claims arising from the exposures of: (i) premises-operations; (ii) products-completed operations including materials designed, furnished, and/or modified in any way by Contractor (with a separate aggregate limit at least equal to the general aggregate limit); (iii) independent subcontractors; (iv) contractual liability risk covering the indemnity obligations set forth in this Agreement; and (v) where applicable, property damage resulting from explosion, collapse, or underground (x, c, u) exposures. The CGL Policy shall not exclude from coverage the type, nature, or volume of the Work or limit the type of structure or number of units on which the Work is to be performed. The CGL policy shall not contain a deductible or self-insured retention of more than $25,000.00, and shall allow the satisfaction of any and all deductible or self-insured retention through payments made by any third party, including but not limited to Owner or any additional insured, co-insureds, co-insurers, or insureds other than the primary or first named insured. Contractor shall continuously maintain a CGL Policy covering products-completed operations for any applicable warranty period, statute of limitation, or statute of repose, whichever is longer, for the filing or asserting of claims, lawsuits or other actions arising out of or relating to the Work.

**11.2 Other Insurance.** Contractor agrees to carry (a) Workers Compensation Insurance that provides statutory benefits and coverage imposed by applicable state or federal law for Contractor's personnel, employees or agents and Contractor shall satisfy all Workers Compensation obligations imposed by law; (b) if Contractor's Work includes design services, Contractor Professional Liability Insurance or Professional Liability Insurance for Architects, Engineers, Surveyors, and other Professional Service Organizations, that provides a per claim limit of no less than One Million Dollars ($1,000,000.00) and an aggregate of no less than One Million Dollars ($1,000,000.00) protecting against faulty design and faulty professional judgment; and (c) Commercial Automobile Liability Insurance coverage with limits of not less than $500,000 per person for bodily injury and $500,000 property damage per occurrence specifying "all autos" coverage or "all owned, leased, hired or non-owned autos."

**11.3 General Requirements Applicable to All Required Insurance.** Contractor shall add Owner, D.R. Horton, Inc., and all affiliates and subsidiaries of D.R. Horton, Inc., (collectively "Horton") as named, Additional Insureds, specifically identifying Horton, on the CGL Policy and policies required above covering both ongoing operations and completed operations (equivalent in scope to form CG 2010 1185 or, if unavailable, both forms CG 2010 1001 and CG 2037 1001). Coverage obtained by Contractor with Horton as an additional insured shall be primary, with any insurance of Horton being excess coverage. Insurance coverages required by this Agreement shall contain unqualified provisions to the effect that the policy shall: (i) not be subject to cancellation, non-renewal, adverse change, or reduction of amounts of coverage without thirty (30) days prior written notice to Owner; (ii) be carried continuously from the date of commencement of the Work until expiration of any applicable warranty period, statute of limitation, or statute of repose, whichever is longer, for the filing or asserting of claims, lawsuits or other actions arising out of or relating to the Work; (iii) provide for a waiver of subrogation; (iv) indicate that coverage applies in the state where the Work is being performed; and (v) be with a carrier licensed to do business in the jurisdiction of the Work with a minimum financial strength rating of A and a financial size rating of VII as determined by A.M. Best with insurance companies acceptable to Owner in its sole and absolute discretion. The amounts and types of insurance required by this Agreement are the minimums required by Owner and shall not be substituted for an independent determination by Contractor of the amounts and other types of insurance that Contractor shall determine to be reasonably necessary to protect itself, the Work, and its obligations under this Agreement. In the event that Contractor obtains insurance coverage that is broader than the minimums required by this Agreement, this Agreement shall be deemed to require the broader coverage, including but not limited to any greater limits.

**11.4 Proof of Insured Status.** Contractor shall provide evidence that all required insurance is in full force by furnishing Owner with a Certificate of Insurance, portions of policies (including but not limited to declarations pages and endorsements), or certified copies of the required policies, as requested by Owner.

**11.5 Reduction of Price for Non-Compliance.** NOTWITHSTANDING THE FOREGOING, IF THE CONTRACTOR FAILS TO PROVIDE OWNER WITH THE REQUIRED EVIDENCE OF INSURANCE, IN ADDITION TO ALL OTHER REMEDIES, OWNER, AT ITS SOLE OPTION, SHALL BE ENTITLED TO: (A) REDUCE THE AMOUNT DUE CONTRACTOR BY THE AMOUNT (ESTABLISHED BY OWNER BY OWNER POLICY WITH RESPECT TO PARTICULAR TRADE CATEGORIES IN ITS SOLE AND ABSOLUTE DISCRETION IN EFFECT AT THE TIME WORK IS PERFORMED) TO COMPENSATE OWNER REASONABLY FOR ANY ADDITIONAL COSTS OF ITS WORKERS COMPENSATION AND GENERAL LIABILITY INSURANCE PREMIUMS AND OWNER'S INCREASED RISKS AND ADMINISTRATIVE COSTS ASSOCIATED WITH DOING BUSINESS WITH UNINSURED CONTRACTORS, THEIR EMPLOYEES OR AGENTS. THIS WITHHOLDING IS NOT PAYMENT FOR INSURANCE AND OWNER IS IN NO WAY AN INSURER OF CONTRACTOR, AND/OR ITS EMPLOYEES OR SUBCONTRACTORS. CONTRACTOR REMAINS OBLIGATED TO PROVIDE INSURANCE FOR ITSELF AND ITS EMPLOYEES UNDER THIS AGREEMENT AND THE AMOUNT WITHHELD MAY EXCEED THE ACTUAL COSTS INCURRED BY OWNER; OR (B) ACCEPT FROM CONTRACTOR A WAIVER OF INSURANCE TO THE EXTENT PERMITTED AND MADE IN ACCORDANCE WITH THE REQUIREMENTS OF ANY APPLICABLE STATUTES OR REGULATIONS.

**11.6 Subcontractor and Supplier Insurance Obligations.** If Contractor subcontracts any of the Work, Contractor warrants and guarantees that each subcontractor shall carry the same insurance required to be carried by Contractor in this Section 11, and that each subcontractor shall name Horton as an additional insured on the required liability policy or policies to the same extent that Contractor is required to do so. Further, Contractor shall require subcontractors and material suppliers to provide to Owner evidence of satisfactory insurance in accordance with the terms of this Agreement.

**11.7 Subrogation.** Contractor hereby waives, releases and discharges all claims and/or rights of recovery by subrogation or otherwise (including but not limited to claims relating to deductible or self-insured retention clauses, inadequacy of limits of any insurance policy, insolvency of any insurer, limitations or exclusions of coverage) against Owner or any Indemnitee, and any of their consultants, subcontractors, agents, employees and representatives. A waiver of subrogation shall be effective as to any individual or entity even if such individual or entity (a) would otherwise have a duty of indemnification, contractual or otherwise, (b) did not pay the insurance premium directly or indirectly, and (c) whether or not such individual or entity has an insurable interest in the property damaged.

## 12. REMEDIES.

**12.1 Owner's Remedies.** If Work performed by Contractor pursuant to this Agreement is defective or incomplete, or if another contractor's work, or other property, is damaged by an act or omission of Contractor, its employees, agents, suppliers, or subcontractors, Owner shall have the right to elect, at its sole discretion to: (i) notify Contractor, at which time Contractor shall promptly correct all or any portion of the Work designated by Owner, and replace or repair any other damaged work or property designated by Owner, at Contractor's expense, within twenty-four (24) hours of notice in an emergency (as determined by Owner in its sole discretion) and within forty-eight (48) hours of notice on a non-emergency basis; or (ii) correct all or any portion of the Work, and replace or repair all or any portion of the other damaged work or property. Owner may retain any sums otherwise due Contractor under any Purchase Order or invoice and apply these sums against such costs to complete, repair, or replace, plus any related costs or damage including re-inspection fees, with any excess to be paid to Contractor. If such costs exceed the funds withheld, Contractor shall be fully responsible for the deficiency, together with any damages and costs, including costs of court and attorneys' fees incurred by Owner, and shall pay this amount to Owner immediately upon demand.

**12.2 Right to Withhold or Offset.** In addition to the remedies in Subsection 12.1, Owner may withhold payment otherwise due Contractor and offset that payment against any damages or expenses incurred by Owner, if: (i) Contractor does not make prompt and proper payments to its employees, agents, and/or subcontractors, or fails to pay for any labor, materials or equipment furnished to Contractor by third parties; (ii) claims or liens

INITIALS: OWNER _____ CONTRACTOR _____

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

are filed against the job location as a result of Contractor's acts or omissions; (iii) in Owner's discretion, Owner reasonably believes that Contractor's Work is not progressing satisfactorily or that the Work cannot or may not be completed in accordance with the terms of this Agreement; (iv) Contractor fails to perform, or to pay the costs and expenses of warranty service, any indemnity claim, taxes or legal order owed by Contractor under this Agreement; (v) Contractor fails to timely provide the evidence of insurance required pursuant to this Agreement and Owner has not expressly waived that insurance; (vi) Contractor fails to promptly pay any fines or penalties imposed against Owner or Contractor related directly or indirectly to the Work; (vii) Contractor has not provided necessary or adequate tools, material, or equipment for, or cleaned up after, the Work; or (viii) Contractor fails to comply with any other provision of this Agreement, or any agreement between Contractor and Owner's parent company, any subsidiary or affiliate. Without limiting the generality of the foregoing, Owner may set offset from amounts owing to Contractor hereunder any amounts owing by Contractor to Owner's parent company, any subsidiary or affiliate, under any agreement between Contractor and any such entity.

**12.3 Remedies Not Exclusive.**   The duties and obligations imposed by this Agreement, and rights and remedies available under this Agreement, shall be independent and cumulative so that no one of them is exclusive, and each is in addition to and not a limitation of duties, obligations, rights, and remedies otherwise imposed or available by law. The assertion by any party of any right or remedy shall not preclude the assertion by such party of any other rights or the seeking of any other remedies allowed.

**12.4 Right to Attorneys' Fees and Expenses.**   Contractor shall pay any and all attorneys' fees and other expenses incurred by Owner in enforcing Contractor's obligations under this Agreement.

### 13. ALTERNATIVE DISPUTE RESOLUTION.

**13.1 Disputes.**  All disputes, whether existing now or arising in the future between them, related in any way to this Agreement, to Contractor's Work, or to any dispute that Owner or Contractor shall have with any third party related to the Work ("Disputes") shall be subject to Alternative Dispute Resolution. These disputes shall include claims related to the construction or sale of any home or property incorporating the Work, including any claims asserting any alleged defects in the Work or any alleged representations and/or warranties, express or implied, relating to the property and/or the improvements. Contractor shall incorporate all of Section 13 in its agreements with subcontractors and suppliers, requiring them to participate in the dispute resolution process described in to the same extent Contractor is required to participate.

**13.2 Mediation.**  If a Dispute cannot be settled through negotiation, Owner and Contractor may agree in good faith to settle the Dispute by mediation. Cost of mediation shall be shared equally by the parties. Notwithstanding the foregoing, a party need not resort to mediation before seeking other relief.

**13.3 Arbitration.**  If the parties are unable to resolve any Dispute by agreement, regardless of any other choice of law provision in any underlying contract or this Agreement, the Dispute shall be submitted to binding arbitration under the Federal Arbitration Act, 9 U.S.C. 1 et seq. ("FAA"). All demands for arbitration shall be made before the expiration of the applicable statutes of limitations or repose, except that any claim by Owner shall not accrue for purposes of any time limitation for claims until Owner has discovered the claim, or could have discovered it by reasonable diligence. The award rendered by the arbitrator(s) shall be final and binding. A petition to confirm, vacate, modify or correct an award may be filed in any court of competent jurisdiction, but the award may be vacated, modified or corrected only as permitted by the FAA.

**13.4 Choice of Mediator and Arbitrator; Number of Arbitrators.**  Any mediation or arbitration shall be administered and conducted by a mediator or arbitrator(s) mutually agreeable to the parties. Three neutral arbitrators shall be appointed if the Dispute, or the aggregate amount of all Disputes against Owner, is for $1,000,000 or more, but only one arbitrator shall be appointed if the Dispute is for less than $1,000,000. If the Dispute or Disputes is to be decided by three arbitrators, then each party shall select a neutral arbitrator within fourteen (14) calendar days of the demand for arbitration is served and the two party-appointed arbitrators shall select a third neutral arbitrator within fourteen (14) calendar days after the two party-appointed arbitrators are selected. If Owner and Contractor cannot agree on the selection of an arbitrator, or if either Owner or Contractor does not appoint an arbitrator or the two party-appointed arbitrators do not select a third arbitrator within the specified time periods, then either Owner or Contractor may file an action with the appropriate court with proper venue and jurisdiction over the dispute to appoint an arbitrator. The AAA/ABA Code of Ethics for Arbitrators in Commercial Disputes (effective March 1, 2004) is applicable to all arbitrations. Any mediation or arbitration shall be conducted in the county where the Work is performed.

**13.5 Rules.**  To the extent not in conflict with the FAA, any mediation and arbitration shall be conducted in accordance with Construction Industry Arbitration Rules and Mediation Procedures of the American Arbitration Association ("AAA") and shall follow settled law in rendering a decision, except that any mediation or arbitration shall be administered by the mediator or the arbitrator(s) and not by the AAA.

**13.6 Consolidation and Joinder.**  Notwithstanding any provision in Section 13 to the contrary, Owner in its sole discretion may join Contractor in any litigation, mediation, or arbitration initiated by Owner, or against Owner by a third person, so that the rights of all parties (Owner, Contractor, subcontractor, or any third person) can be subject to resolution in a single forum in the same proceeding. Contractor shall be bound by any arbitration procedures and rules accepted by Owner. If multiple lawsuits or arbitrations are commenced, Owner in its sole discretion may consolidate them into a single proceeding. Notwithstanding any other provision of this Section 13, if Owner determines in its sole discretion that a subcontractor or material supplier of Contractor, or any other third party whose presence is required for a just adjudication of the Dispute, cannot be forced to mediate or arbitrate, Owner may elect unilaterally to waive mediation or arbitration and to litigate the Dispute in court with Contractor.

### 14. TERMINATION.

**14.1 Termination by Owner.**  This Agreement shall remain in full force and effect until terminated in writing by Owner by mailing notice to Contractor. Owner may terminate this Agreement at any time, whether or not Contractor is in default or breach of the Agreement. If the Agreement is terminated by Owner, notwithstanding any other agreement to the contrary, the sole amount due to Contractor shall be that due for all authorized Work performed and materials supplied before termination, subject to deductions and charges authorized by this Agreement.

**14.2 Termination by Contractor.**  Contractor shall provide one hundred twenty (120) days written notice to Owner before the effective date of any termination by Contractor, and shall perform fully under this Agreement during that notice period.

**14.3 Survival.**  All obligations, duties and warranties by Contractor under this Agreement shall survive termination of this Agreement.

**15. CONTRACTOR'S REPRESENTATIONS.**  Contractor represents to Owner that: (i) the person executing this Agreement on behalf of Contractor is duly authorized and has full power to execute and deliver this Agreement; (ii) all corporate, partnership, or other action requisite for the due execution of this Agreement has been duly and effectively taken or shall be taken before the execution and delivery of this Agreement; (iii) this Agreement is or will be (when executed) a binding obligations of Contractor, enforceable in accordance with its terms; (iv) this Agreement and Contractor's performance, does not and will not violate any provisions of Contractor's constituent or organizational documents, or any contract, agreement, or governmental requirement to which Contractor is subject, and the same do not require the consent or approval of any governmental authority; (v) Contractor has, and each Contractor's employees, agents or subcontractors shall have, the requisite skills, expertise, experience, licenses, and knowledge to perform the Work in compliance with this Agreement; (vi) Contractor is in compliance with all governmental requirements to which it is subject; and (vii) Contractor has the financial ability and resources to perform the Work and all other obligations, duties, and covenants of Contractor under this Agreement.



INITIALS: OWNER _____ CONTRACTOR _____.

ELECTRONICALLY FILED - 2022 Oct 26 6:38 PM - JASPER - COMMON PLEAS - CASE#2021CP2700069
ELECTRONICALLY FILED - 2025 Aug 20 3:39 PM - JASPER - COMMON PLEAS - CASE#2025CP2700479

**16. GENERAL CONTRACT PROVISIONS.**

**16.1 Entire Agreement.** This Agreement shall be the entire agreement between Owner and Contractor related to the Work and shall be deemed to amend and supersede all prior Independent Contractor Agreements (other than any Master National Independent Contractor Agreement) or other prior understandings or written or oral agreements, specifically including but not limited to all prior pre-printed standard contractor/subcontractor agreements (including attached exhibits) entered into between Owner and Contractor for the provision of goods or services or both by Contractor relating to the subject matter herein. All current Pricing Schedules and Purchase Orders shall remain valid and binding for the Work and shall be deemed subject to the terms of this Agreement. Any future Pricing Schedules or Purchase Orders entered into hereafter shall also be deemed to be subject to the terms of this Agreement. Past and future Pricing Schedules and Purchase Orders shall control only for the purpose of establishing prices and quantities of sale only. Nothing in any subsequent agreement or document, unless a new Independent Contractor Agreement, shall alter the terms set forth in this Agreement. To the extent possible, this Agreement shall be deemed to supplement the terms of any other agreement or document, unless a new Independent Contractor Agreement. In the event of any conflict between this Agreement and other such documents, this Agreement shall be deemed to control and prevail. Except as otherwise provided in this Agreement, no amendment or supplement to this Agreement shall be valid or binding unless in writing and signed by both Owner and Contractor. Notwithstanding anything in this Subsection to the contrary, this Agreement shall not amend or supersede any Master National Independent Contractor Agreement, but shall supplement its terms. In the event of a conflict, to the extent permitted by law, the Master National Independent Contractor Agreement shall control.

**16.2 Severability.** The provisions of this Agreement shall be deemed independent and severable, and the invalidity or partial invalidity of any provision or portion of it shall not affect the validity or enforceability of any other provision or portion.

**16.3 Assignability.** Contractors' rights, responsibilities, and obligations under this Agreement are not assignable or transferable without the express written consent of Owner, which consent may be withheld in Owner's sole and absolute discretion. Any attempted assignment shall be null and void. This restriction includes, without limitation, the delegation or subcontracting of any Work or any amounts which may become due to Contractor as a result of the Work. Contractor shall remain fully liable under this Agreement regardless of any consent by Owner to any assignment or delegation of duties by Contractor, including but not limited to any work by a subcontractor. Contractor shall ensure that any subcontractor receives a copy of this Agreement and agrees in writing to be fully responsible for all obligations of Contractor under this Agreement, including but not limited to the insurance and indemnity provisions. Contractor shall also ensure that Owner is an intended third party beneficiary of any subcontractor agreement by including a specific provision to that effect. Contractor shall be responsible for enforcing any warranties given by its subcontractors, suppliers or manufacturers. Nothing contained herein, however, shall create any contractual relationship between Owner and any subcontractor, nor create any obligation on the part of Owner to make payment of any sums to any subcontractor. Subject to the restrictions and prohibitions on assignment set forth in this Subsection, the terms of this Agreement shall be binding on Owner, Contractor, and their respective successors, representatives, heirs and assigns. Owner may freely assign this Agreement, in whole or in part.

**16.4 Conflicts with Purchase Orders or Other Agreements.** If this Agreement conflicts with the terms of any Purchase Order or any other agreement or document pertaining to the Work, the terms of this Agreement shall control.

**16.5 Waiver.** No act or conduct other than a specific, written waiver of a right shall be deemed a waiver by Owner. No delay or failure by Owner to exercise any right under this Agreement, and no partial or single exercise of that right, will waive that or any other right except by written agreement executed by Owner.

**16.6 Choice of Law.** This Agreement shall be governed by the law of the State of South Carolina.

**17. CONFIDENTIALITY.** Contractor shall treat all information obtained by Contractor relating to the project to which the Work relates and all information and documents provided to Contractor by or on behalf of Owner as confidential and proprietary information of Owner, and shall not disclose or permit the release of any of that information to any third party. Immediately upon request by Owner, Contractor shall return any and all confidential material or proprietary property or documents to Owner.

**18. NOTICES.** All notices required or permitted pursuant to this Agreement or otherwise shall be in writing and shall be delivered as follows: to Contractor at Contractor's business address as shown on page one (1) of this Agreement; to Owner through Owner's official Registered Agent for service of legal process in the state where the Work is performed at that Registered Agent's registered office. Notices may be given by personal delivery, facsimile, commercial overnight delivery service, personal delivery or ordinary mail and shall be deemed to be received three (3) business days after deposit, postage prepaid, in the U.S. Mail when sent registered or certified mail, return receipt requested, the following day if sent timely by commercial overnight delivery service, and upon confirmation if sent by facsimile transmission or by personal delivery. Rejection, refusal to accept or the inability to deliver because of changed address shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

**19. MISCELLANEOUS.** Unless the context requires a contrary construction, the singular shall include the plural, and the plural the singular. Any reference to gender shall include the masculine, feminine, and neuter. All captions and titles used in this Agreement are intended solely for convenience of reference and shall not enlarge, limit, or otherwise affect that which is set forth in any of its paragraphs, sections or subsections.

INITIALS: OWNER_____ CONTRACTOR_____.